## PHELPS DODGE CORP. *v.* NATIONAL LABOR RELATIONS BOARD.*

No. 387.  Argued March 11, 1941.—Decided April 28, 1941.

---

*Together with No. 641, *National Labor Relations Board* v. *Phelps Dodge Corp.*, also on writ of certiorari, 312 U. S. 669, to the Circuit Court of Appeals for the Second Circuit.

*Mr. Denison Kitchel,* with whom *Messrs. John Mason Ross, Matthew C. Fleming,* and *William E. Stevenson* were on the brief, for the Phelps Dodge Corporation.

*Mr. Thomas E. Harris*, with whom *Solicitor General Biddle* and *Messrs. Robert B. Watts, Laurence A. Knapp, Mortimer B. Wolf*, and *Morris P. Glushien* were on the brief, for the National Labor Relations Board.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The dominating question which this litigation brings here for the first time is whether an employer subject to the National Labor Relations Act may refuse to hire employees solely because of their affiliations with a labor union. Subsidiary questions grow out of this central issue relating to the means open to the Board to "effectuate the policies of this Act," if it finds such discrimination in hiring an "unfair labor practice." Other questions touching the remedial powers of the Board are also involved. We granted a petition by the Phelps Dodge Corporation and a cross-petition by the Board, 312 U. S. 669, to review a decision by the Circuit Court of Appeals for the Second Circuit, 113 F. 2d 202, which enforced the order of the Board, 19 N. L. R. B. 547, with modifications. The main issue is intrinsically important and has stirred a conflict of decisions. *Labor Board* v. *Waumbec Mills*, 114 F. 2d 226.

The source of the controversy was a strike, begun on June 10, 1935, by the International Union of Mine, Mill and Smelter Workers at Phelps Dodge's Copper Queen Mine, Bisbee, Arizona. Picketing of the mine continued until August 24, 1935, when the strike terminated. During the strike, the National Labor Relations Act came into force. Act of July 5, 1935, 49 Stat. 449. 29 U. S. C. § 151 *et seq.* The basis of the Board's conclusion that the Corporation had committed unfair labor practices in violation of § 8 (3) of the Act was a finding, not challenged here, that a number of men had been refused employment

because of their affiliations with the Union. Of these men, two, Curtis and Daugherty, had ceased to be in the Corporation's employ before the strike but sought employment after its close. The others, thirty-eight in number, were strikers. To "effectuate the policies" of the Act, § 10 (c), the Board ordered the Corporation to offer Curtis and Daugherty jobs and to make them whole for the loss of pay resulting from the refusal to hire them, and it ordered thirty-seven of the strikers reinstated with back pay, and the other striker made whole for loss in wages up to the time he became unemployable. Save for a modification presently to be discussed, the Circuit Court of Appeals enforced the order affecting the strikers but struck down the provisions relating to Curtis and Daugherty.

*First.* The denial of jobs to men because of union affiliations is an old and familiar aspect of American industrial relations. Therefore, in determining whether such discrimination legally survives the National Labor Relations Act, the history which led to the Act and the aims which infuse it give direction to our inquiry. Congress explicitly disclosed its purposes in declaring the policy which underlies the Act. Its ultimate concern, as well as the source of its power, was "to eliminate the causes of certain substantial obstructions to the free flow of commerce." This vital national purpose was to be accomplished "by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association." § 1. Only thus could workers ensure themselves economic standards consonant with national well-being. Protection of the workers' right to self-organization does not curtail the appropriate sphere of managerial freedom; it furthers the wholesome conduct of business enterprise. "The Act," this Court has said, "does not interfere with the normal exercise of the right of the employer to select

its employees or to discharge them." But "under cover of that right," the employer may not "intimidate or coerce its employees with respect to their self-organization and representation." When "employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge." *Labor Board* v. *Jones & Laughlin*, 301 U. S. 1, 45, 46. This is so because of the nature of modern industrialism. Labor unions were organized "out of the necessities of the situation. . . . Union was essential to give laborers opportunity to deal on equality with their employer." Such was the view, on behalf of the Court, of Chief Justice Taft, *American Steel Foundries* v. *Tri-City Council*, 257 U. S. 184, 209, after his unique practical experience with the causes of industrial unrest as co-chairman of the National War Labor Board. And so the present Act, codifying this long history, leaves the adjustment of industrial relations to the free play of economic forces but seeks to assure that the play of those forces be truly free.

It is no longer disputed that workers cannot be dismissed from employment because of their union affiliations. Is the national interest in industrial peace less affected by discrimination against union activity when men are hired? The contrary is overwhelmingly attested by the long history of industrial conflicts, the diagnosis of their causes by official investigations, the conviction of public men, industrialists and scholars.[1] Because of

---

[1] United States Industrial Commission, Final Report (1902) p. 892; Anthracite Coal Strike Commission, Report to the President on the Coal Strike of May–October, 1902, S. Doc. No. 6, 58th Cong., Spec. Sess., p. 78; Laidler, Boycotts and the Labor Struggle (1913) p. 39 *et seq.;* United States Commission on Industrial Relations, Final Report (1916) S. Doc. No. 415, 64th Cong., 1st Sess., p. 118;

the Pullman strike, Congress in the Erdman Act of 1898 prohibited inroads upon the workingman's right of association by discriminatory practices at the point of hiring.[2] Kindred legislation has been put on the statute books of more than half the states.[3] And during the late war the National War Labor Board concluded that discrimination against union men at the time of hiring violated its declared policy that "The right of workers to organize in trade-unions and to bargain collectively . . .

---

Interchurch World Movement, Commission of Inquiry, Report on the Steel Strike of 1919 (1920) pp. 27, 209, 219; Bonnet, Employers' Associations in the United States (1922) pp. 80, 296, 550; Gulick, Labor Policy of the United States Steel Corporation (1924) pp. 125–27; Cummins, The Labor Problem in the United States (2d ed. 1935) p. 351; Bureau of Labor Investigation of Western Union and Postal Telegraph-Cable Companies (1909) S. Doc. No. 725, 60th Cong., 2d Sess., pp. 39–41; S. Rep. No. 46, Part 1, 75th Cong., 1st Sess., p. 8.

[2] 30 Stat. 424; see United States Strike Commission, Report on the Chicago Strike of June–July, 1894, S. Doc. No. 7, 53d Cong., 3d Sess.; Olney, Discrimination Against Union Labor—Legal? (1908) 42 Amer. L. Rev. 161.

[3] Ala. Code Ann. (1928) § 3451; Ark., Acts of 1905, Act 214, p. 545; Cal. Labor Code (1937) § § 1050–54; Colo. Stat. Ann. (1935) c. 97, § § 88, 89, 93; Conn. Gen. Stat. (1930) § § 6210–11; Fla. Comp. Gen. Laws Ann. (1927) § 6606; Ill. Ann. Stat. (1935) c. 38, § 139; Ind. Stat. Ann. (1933) § § 40–301, 40–302; Iowa Code (1939) §§ 13253–54; Kan. Gen. Stat. (1935) §§ 44–117, 44–118, 44–119; Me. Laws (1933) c. 108; Minn. Stat. (1927) § 10378; Miss. Code Ann. (1927) § § 9271–74; Mo. Rev. Stat. (1939) § 4643; Mont. Rev. Code Ann. (1935) § § 3093–94; Nev. Comp. Laws (1929) § § 10461–63; N. M. Stat. Ann. (1929) § § 35–4613, 35–4614, 35–4615; New York Labor Law § 704(2), (9); N. C. Code Ann. (1939) § § 4477–78; N. D. Comp. Laws Ann. (1913) § 9446; Okla. Stat. Ann. (1937) tit. 40, § § 172–73; Ore. Comp. Laws Ann. (1940) § § 102–806, 102–807; Tex. Stat. (1936) arts. 1616–1618; Utah Rev. Stat. Ann. (1933) § § 49–5–1, 49–5–2; Va. Code (1936) § 1817; Wash. Rev. Stat. Ann. (1932) § 7599; Wis. Stat. (1939) § 343.682. See (1937) 37 Col. L. Rev. 816, 819; Witte, The Government in Labor Disputes (1932) pp. 213–18.

shall not be denied, abridged, or interfered with by the employers in any manner whatsoever."[4] Such a policy is an inevitable corollary of the principle of freedom of organization. Discrimination against union labor in the hiring of men is a dam to self-organization at the source of supply. The effect of such discrimination is not confined to the actual denial of employment; it inevitably operates against the whole idea of the legitimacy of organization. In a word, it undermines the principle which, as we have seen, is recognized as basic to the attainment of industrial peace.

These are commonplaces in the history of American industrial relations. But precisely for that reason they must be kept in the forefront in ascertaining the meaning of a major enactment dealing with these relations. To be sure, in outlawing unfair labor practices Congress did not leave the matter at large. The practices condemned "are strictly limited to those enumerated in section 8," S. Rep. No. 573, 74th Cong., 1st Sess., p. 8. Section 8 (3) is the foundation of the Board's determination that in refusing employment to the two men because of their union affiliations Phelps Dodge violated the Act. And so we turn to its provisions that "It shall be an unfair labor practice for an employer . . . By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."

Unlike mathematical symbols, the phrasing of such social legislation as this seldom attains more than approximate precision of definition. That is why all relevant aids are summoned to determine meaning. Of compelling

---

[4] Awards of the National War Labor Board: Sloss-Sheffield Steel & Iron Co., Docket No. 12. See also Omaha & Council Bluffs Street Ry., Docket No. 154; Smith & Wesson Co., Docket No. 273. Cf. Gregg, The National War Labor Board (1919) 33 Harv. L. Rev. 39.

consideration is the fact that words acquire scope and function from the history of events which they summarize. We have seen the close link between a bar to employment because of union affiliation and the opportunities of labor organizations to exist and to prosper. Such an embargo against employment of union labor was notoriously one of the chief obstructions to collective bargaining through self-organization. Indisputably the removal of such obstructions was the driving force behind the enactment of the National Labor Relations Act. The prohibition against "discrimination in regard to hire" must be applied as a means towards the accomplishment of the main object of the legislation. We are asked to read "hire" as meaning the wages paid to an employee so as to make the statute merely forbid discrimination in one of the terms of men who have secured employment. So to read the statute would do violence to a spontaneous textual reading of § 8 (3) in that "hire" would serve no function because, in the sense which is urged upon us, it is included in the prohibition against "discrimination in regard to . . . any term or condition of employment." Contemporaneous legislative history,[5] and, above all, the background of industrial experience, forbid such textual mutilation.

The natural construction which the text, the legislative setting and the function of the statute command, does not impose an obligation on the employer to favor union members in hiring employees. He is as free to hire as he is to

---

[5] Rather clearly the House Committee which reported the bill viewed the word "hire" as covering the situation before us. H. R. Rep. No. 1147, 74th Cong., 1st Sess., p. 19. The Chairman of the Senate Committee expressly stated during the debate that "no employer may discriminate in hiring a man whether he belongs to a union or not, and without regard to what union he belongs [except where there is a valid closed shop agreement]." 79 Cong. Rec. 7674. For further materials bearing on the legislative history see the able opinion of Judge Magruder in *Labor Board* v. *Waumbec Mills*, 114 F. 2d 226.

discharge employees. The statute does not touch "the normal exercise of the right of the employer to select its employees or to discharge them." It is directed solely against the abuse of that right by interfering with the countervailing right of self-organization.

We have already recognized the power of Congress to deny an employer the freedom to discriminate in discharging. *Labor Board* v. *Jones & Laughlin,* 301 U. S. 1. So far as questions of constitutionality are concerned we need not enlarge on the statement of Judge Learned Hand in his opinion below that there is "no greater limitation in denying him [the employer] the power to discriminate in hiring, than in discharging." The course of decisions in this Court since *Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1, have completely sapped those cases of their authority. *Pennsylvania R. Co.* v. *Labor Board,* 261 U. S. 72; *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548; *Virginian Ry.* v. *Federation,* 300 U. S. 515; *Labor Board* v. *Jones & Laughlin, supra.*

*Second.* Since the refusal to hire Curtis and Daugherty solely because of their affiliation with the Union was an unfair labor practice under § 8 (3), the remedial authority of the Board under § 10 (c) became operative. Of course it could issue, as it did, an order "to cease and desist from such unfair labor practice" in the future. Did Congress also empower the Board to order the employer to undo the wrong by offering the men discriminated against the opportunity for employment which should not have been denied them?

Reinstatement is the conventional correction for discriminatory discharges. Experience having demonstrated that discrimination in hiring is twin to discrimination in firing, it would indeed be surprising if Congress gave a remedy for the one which it denied for the other. The powers of the Board as well as the restrictions upon

it must be drawn from § 10 (c), which directs the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." It could not be seriously denied that to require discrimination in hiring or firing to be "neutralized," *Labor Board* v. *Mackay Co.*, 304 U. S. 333, 348, by requiring the discrimination to cease not abstractly but in the concrete victimizing instances, is an "affirmative action" which "will effectuate the policies of this Act." Therefore, if § 10 (c) had empowered the Board to "take such affirmative action as will effectuate the policies of this Act," the right to restore to a man employment which was wrongfully denied him could hardly be doubted. Even without such a mandate from Congress this Court compelled reinstatement to enforce the legislative policy against discrimination represented by the Railway Labor Act. *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548.[6] Attainment of a great national policy through expert administration in collaboration with limited judicial review must not be confined within narrow canons for equitable relief deemed suitable by chancellors in ordinary private controversies. Compare *Virginian Ry.* v. *Federation*, 300 U. S. 515, 552. To differentiate between discrimination in denying employment and in terminating it, would be a differentiation not only without substance but in defiance of that against which the prohibition of discrimination is directed.

But, we are told, this is precisely the differentiation Congress has made. It has done so, the argument runs,

---

[6] An injunction had been granted against interference with the workers' self-organization and reinstatement was ordered in contempt proceedings after employees had been discharged for union activities. Surely, a court of equity has no greater inherent authority in this regard than was conveyed to the Board by the broad grant of all such remedial powers as will, from case to case, translate into actuality the policies of the Act.

by not directing the Board "to take such affirmative action as will effectuate the policies of this Act," *simpliciter*, but, instead, by empowering the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." To attribute such a function to the participial phrase introduced by "including" is to shrivel a versatile principle to an illustrative application. We find no justification whatever for attributing to Congress such a casuistic withdrawal of the authority which, but for the illustration, it clearly has given the Board. The word "including" does not lend itself to such destructive significance. *Helvering* v. *Morgan's, Inc.*, 293 U. S. 121, 125, note.

*Third.* We agree with the court below that the record warrants the Board's finding that the strikers were denied reëmployment because of their union activities. Having held that the Board can neutralize such discrimination in the case of men seeking new employment, the Board certainly had this power in regard to the strikers. And so we need not consider whether the order concerning the strikers should stand, as the court below held it should, even though that against Curtis and Daugherty would fall.

*Fourth.* There remain for consideration the limitations upon the Board's power to undo the effects of discrimination. Specifically, we have the question of the Board's power to order employment in cases where the men discriminated against had obtained "substantially equivalent employment." The Board as a matter of fact found that no such employment had been obtained, but alternatively concluded that, in any event, the men should be offered employment. The court below, on the other hand, in harmony with three other circuits, *Mooresville Cotton Mills* v. *Labor Board*, 94 F. 2d 61 (C. C. A. 4th); *Labor Board* v. *Botany Worsted Mills*,

106 F. 2d 263 (C. C. A. 3rd); *Labor Board* v. *Carlisle Lumber Co.*, 99 F. 2d 533 (C. C. A. 9th), ruled that employment need not be offered any worker who had obtained such employment, and since the record as to some of the strikers who had gone to work at the Shattuck Denn Company was indecisive on this issue, remanded the case to the Board for further findings. This aspect of the Board's authority depends on the relation of the general remedial powers conferred by § 10 (c) to the provisions of § 2 (3).

The specific provisions of the Act out of which the proper conclusion is to be drawn should be before us. Section 10 (c), as we already know, authorizes the Board "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." The relevant portions of § 2 (3) follow: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment."

Merely as a matter of textual reading these provisions in combination permit three possible constructions: (1) a curtailment of the powers of the Board to take affirmative action by reading into § 10 (c) the restrictive phrase of § 2 (3) regarding a worker "who has not obtained any other regular and substantially equivalent employment"; (2) a completely distributive reading of § 10 (c) and § 2 (3), whereby the factor of "regular and substantially equivalent employment" in no way limits the Board's usual power to require employment to be offered a worker who has lost employment because of discrimination; (3) an avoidance of this either-or read-

ing of the statute by pursuing the central clue to the Board's powers—effectuation of the policies of the Act—and in that light appraising the relevance of a worker's having obtained "substantially equivalent employment."

Denial of the Board's power to order opportunities of employment in this situation derives wholly from an infiltration of a portion of § 2 (3) into § 10 (c). The argument runs thus: § 10 (c) specifically refers to "reinstatement of employees"; the latter portion of § 2 (3) refers to an "employee" as a person "who has not obtained any other regular and substantially equivalent employment"; therefore, there can be no reinstatement of an employee who has obtained such employment. The syllogism is perfect. But this is a bit of verbal logic from which the meaning of things has evaporated. In the first place, we have seen that the Board's power to order an opportunity for employment does not derive from the phrase "including reinstatement of employees with or without back pay," and is not limited by it. Secondly, insofar as any argument is to be drawn from the reference to "employees" in § 10 (c), it must be noted that the reference is to "employees," unqualified and undifferentiated. To circumscribe the general class, "employees," we must find authority either in the policy of the Act or in some specific delimiting provision of it.

Not only is the Act devoid of a comprehensive definition of "employee" restrictive of § 10 (c) but the contrary is the fact. The problem of what workers were to be covered by legal remedies for assuring the right of self-organization was a familiar one when Congress formulated the Act. The policy which it expressed in defining "employee" both affirmatively and negatively, as it did in § 2 (3), had behind it important practical and judicial experience: "The term 'employee'," the section reads, "shall include any employee, and shall not

be limited to the employees of a particular employer, unless the Act explicitly states otherwise. . . ." This was not fortuitous phrasing. It had reference to the controversies engendered by constructions placed upon the Clayton Act and kindred state legislation in relation to the functions of workers' organizations and the desire not to repeat those controversies. Cf. *New Negro Alliance* v. *Grocery Co.*, 303 U. S. 552. The broad definition of "employee," "unless the Act explicitly states otherwise," as well as the definition of "labor dispute" in § 2 (9), expressed the conviction of Congress "that disputes may arise regardless of whether the disputants stand in the proximate relation of employer and employee, and that self-organization of employees may extend beyond a single plant or employer." H. R. Rep. No. 1147, 74th Cong., 1st Sess., p. 9; see also S. Rep. No. 573, 74th Cong., 1st Sess., pp. 6, 7.

The reference in § 2 (3) to workers who have "obtained regular and substantially equivalent employment" has a rôle consonant with some purposes of the Act but not one destructive of the broad definition of "employee" with which § 2 (3) begins. In determining whether an employer has refused to bargain collectively with the representatives of "his employees" in violation of § 8 (5) and § 9 (a) it is of course essential to determine who constitute "his employees." One aspect of this is covered by § 9 (b) which provides for determination of the appropriate bargaining unit. And once the unit is selected, the reference in § 2 (3) to workers who have obtained equivalent employment comes into operation in determining who shall be treated as employees within the unit.

To deny the Board power to neutralize discrimination merely because workers have obtained compensatory employment would confine the "policies of this Act" to the

correction of private injuries. The Board was not devised for such a limited function. It is the agency of Congress for translating into concreteness the purpose of safeguarding and encouraging the right of self-organization. The Board, we have held very recently, does not exist for the "adjudication of private rights"; it "acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining." *National Licorice Co.* v. *Labor Board,* 309 U. S. 350, 362; and see *Amalgamated Utility Workers* v. *Edison Co.,* 309 U. S. 261. To be sure, reinstatement is not needed to repair the economic loss of a worker who, after discrimination, has obtained an equally profitable job. But to limit the significance of discrimination merely to questions of monetary loss to workers would thwart the central purpose of the Act, directed as that is toward the achievement and maintenance of workers' self-organization. That there are factors other than loss of wages to a particular worker to be considered is suggested even by a meager knowledge of industrial affairs. Thus, to give only one illustration, if men were discharged who were leading efforts at organization in a plant having a low wage scale, they would not unnaturally be compelled by their economic circumstances to seek and obtain employment elsewhere at equivalent wages. In such a situation, to deny the Board power to wipe out the prior discrimination by ordering the employment of such workers would sanction a most effective way of defeating the right of self-organization.

Therefore, the mere fact that the victim of discrimination has obtained equivalent employment does not itself preclude the Board from undoing the discrimination and requiring employment. But neither does this remedy automatically flow from the Act itself when discrim-

ination has been found. A statute expressive of such large public policy as that on which the National Labor Relations Board is based must be broadly phrased and necessarily carries with it the task of administrative application. There is an area plainly covered by the language of the Act and an area no less plainly without it. But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility—the responsibility of exercising its judgment in employing the statutory powers.

The Act does not create rights for individuals which must be vindicated according to a rigid scheme of remedies. It entrusts to an expert agency the maintenance and promotion of industrial peace. According to the experience revealed by the Board's decisions, the effectuation of this important policy generally requires not only compensation for the loss of wages but also offers of employment to the victims of discrimination. Only thus can there be a restoration of the situation, as nearly as possible, to that which would have obtained but for the illegal discrimination. But even where a worker has not secured equivalent employment, the Board, under particular circumstances, may refuse to order his employment

because it would not effectuate the policies of the Act. It has, for example, declined to do so in the case of a worker who had been discharged for union activities and had sought reëmployment after having offered his services as a labor spy. Matter of Thompson Cabinet Co., 11 N. L. R. B. 1106, 1116–17.

From the beginning the Board has recognized that a worker who has obtained equivalent employment is in a different position from one who has lost his job as well as his wages through an employer's unfair labor practice. In early decisions, the Board did not order reinstatement of workers who had secured such equivalent employment. See Matter of Rabhor Co., Inc., 1 N. L. R. B. 470, 481; Matter of Jeffery-De Witt Insulator Co., 1 N. L. R. B. 618, 628. It apparently focussed on the absence of loss of wages in determining the applicable remedy. But other factors may well enter into the appropriateness of ordering the offending employer to offer employment to one illegally denied it. Reinstatement may be the effective assurance of the right of self-organization. Again, without such a remedy industrial peace might be endangered because workers would be resentful of their inability to return to jobs to which they may have been attached and from which they were wrongfully discharged. On the other hand, it may be, as was urged on behalf of the Board in *Mooresville Cotton Mills* v. *Labor Board,* 97 F. 2d 959, 963, that, in making such an order for reinstatement the necessity for making room for the old employees by discharging new ones, as well as questions affecting the dislocation of the business, ought to be considered. All these and other factors outside our domain of experience may come into play. Their relevance is for the Board, not for us. In the exercise of its informed discretion the Board may find that effectuation of the Act's policies may or may not require reinstatement. We have no warrant for speculating on matters of fact the determination of

which Congress has entrusted to the Board. All we are entitled to ask is that the statute speak through the Board where the statute does not speak for itself.

The only light we have on the Board's decision in this case is its statement that, if any of the workers discriminated against had obtained substantially equivalent employment, they should be offered employment "for the reasons set forth in" Matter of Eagle-Picher Mining & Smelting Co., 16 N. L. R. B. 727, 833. But in that case the Board merely concluded that § 2 (3) did not deny it the power to order reinstatement; it did not consider the appropriateness of its exercise. Thus the Board determined only the dry legal question of its power, which we sustain; it did not consider whether in employing that power the policies of the Act would be enforced. The court below found, and the Board has not challenged the finding, that the Board left the issue of equivalence of jobs at the Shattuck Denn Company in doubt, and remanded the order to the Board for further findings. Of course, if the Board finds that equivalent employment has not been obtained, it is within its province to require offers of reëmployment in accordance with its general conclusion that a worker's loss in wages and in general working conditions must be made whole. Even if it should find that equivalent jobs were secured by the men who suffered from discrimination, it may order employment at Phelps Dodge if it finds that to do so would effectuate the policies of the Act. We believe that the procedure we have indicated will likewise effectuate the policies of the Act by making workable the system of restricted judicial review in relation to the wide discretionary authority which Congress has given the Board.

From the record of the present case we cannot really tell why the Board has ordered reinstatement of the strikers who obtained subsequent employment. The Board first found that the men had not obtained sub-

stantially equivalent employment within the meaning of § 2 (3).; later it concluded that even if they had obtained such employment it would order their reinstatement. It did so, however, as we have noted, merely because it asserted its legal power so to do. When the court below held that proof did not support the Board's finding concerning equivalence of employment at Shattuck Denn and remanded the case to the Board for additional evidence on that issue, the Board took this issue out of the case by expressly declining to ask for its review here.

The administrative process will best be vindicated by clarity in its exercise. Since Congress has defined the authority of the Board and the procedure by which it must be asserted and has charged the federal courts with the duty of reviewing the Board's orders (§ 10 (e) and (f)), it will avoid needless litigation and make for effective and expeditious enforcement of the Board's order to require the Board to disclose the basis of its order. We do not intend to enter the province that belongs to the Board, nor do we do so. All we ask of the Board is to give clear indication that it has exercised the discretion with which Congress has empowered it. This is to affirm most emphatically the authority of the Board.

*Fifth.* As part of its remedial action against the unfair labor practices, the Board ordered that workers who had been denied employment be made whole for their loss of pay. In specific terms, the Board ordered payment to the men of a sum equal to what they normally would have earned from the date of the discrimination to the time of employment less their earnings during this period. The court below added a further deduction of amounts which the workers "failed without excuse to earn," and the Board here challenges this modification.

Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces.

Since only actual losses should be made good, it seems fair that deductions should be made not only for actual earnings by the worker but also for losses which he willfully incurred. To this the Board counters that to apply this abstractly just doctrine of mitigation of damages to the situations before it, often involving substantial numbers of workmen, would put on the Board details too burdensome for effective administration. Simplicity of administration is thus the justification for deducting only actual earnings and for avoiding the domain of controversy as to wages that might have been earned.

But the advantages of a simple rule must be balanced against the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment. The Board, we believe, overestimates administrative difficulties and underestimates its administrative resourcefulness. Here again we must avoid the rigidities of an either-or rule. The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act. And in applying its authority over back pay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress to attain just results in diverse, complicated situations.[7] See (1939) 48 Yale L. J.

---

[7] In accordance with the Board's general practice, deductions were made in the present case for amounts earned during the period of the back pay award. But the deductions have been limited to earnings during the hours when the worker would have been employed by the employer in question. Matter of Pusey, Maynes & Breish Co., 1 N. L. R. B. 482; Matter of National Motor Bearing Co., 5 N. L. R. B. 409. And only "net earnings" are deducted, allowance being made for the expense of getting new employment which, but for the discrimination, would not have been necessary. Matter of Crossett Lumber Co., 8 N. L. R. B. 440.

Even though a strike is caused by an unfair labor practice the Board does not award back pay during the period of the strike. Matter of Sunshine Hosiery Mills, 1 N. L. R. B. 664. Employees who are discriminatorily discharged are treated as strikers if during

1265. The Board has a wide discretion to keep the pres-. ent matter within reasonable bounds through flexible procedural devices. The Board will thus have it within its power to avoid delays and difficulties incident to passing on remote and speculative claims by employers, while at the same time it may give appropriate weight to a clearly

---

a strike they refuse an unconditional offer of reinstatement. Matter of Harter Corp., 8 N. L. R. B. 391. Originally back pay was ordered from the date of application for reinstatement, Matter of Sunshine Hosiery Mills, *supra*, but later orders have started back pay five days after application. Matter of Tiny Town Togs, Inc., 7 N. L. R. B. 54.

If there is unjustified delay in filing charges before the Board, a deduction is made for the period of the delay. Matter of Inland Lime & Stone Co., 8 N. L. R. B. 944. Similar action is taken when a case is reopened after having been closed or withdrawn. Matter of C. G. Conn, Ltd., 10 N. L. R. B. 498. And if the trial examiner rules in favor of the employer and the Board reverses the ruling, no back pay is ordered for the period when the examiner's ruling stood unreversed. Matter of E. R. Haffelfinger Co., 1 N. L. R. B. 760; and see the order in the present case.

The Board has refused to order any back pay where discriminatory discharges were made with honest belief that they were required by an invalid closed-shop contract. Matter of McKesson & Robbins, Inc., 19 N. L. R. B. 778.

If the business conditions would have caused the plant to be closed or personnel to be reduced, back pay is awarded only for the period which the worker would have worked in the absence of discrimination. Matter of Ray Nichols, Inc., 15 N. L. R. B. 846. At times fluctuations in personnel so complicate the situation that a formula has to be devised for the distribution of a lump sum among the workers who have been discriminated against. Matter of Eagle-Picher Mining & Smelting Co., 16 N. L. R. B. 727.

The rate of pay used in computing awards is generally that at the time of discrimination, but adjustments may be made for subsequent changes. Matter of Lone Star Bag & Bagging Co., 8 N. L. R. B. 244; cf. Matter of Acme Air Appliance Co., 10 N. L. R. B. 1385. Normal earnings in tips or bonuses have been taken into account. Matter of Club Troika, 2 N. L. R. B. 90; Matter of Central Truck Lines, 3 N. L. R. B. 317.

unjustifiable refusal to take desirable new employment. By leaving such an adjustment to the administrative process we have in mind not so much the minimization of damages as the healthy policy of promoting production and employment. This consideration in no way weakens the enforcement of the policies of the Act by exerting coercion against men who have been unfairly denied employment to take employment elsewhere and later, because of their new employment, declaring them barred from returning to the jobs of their choice. This is so because we hold that the power of ordering offers of employment rests with the Board even as to workers who have obtained equivalent employment.

But though the employer should be allowed to go to proof on this issue, the Board's order should not have been modified by the court below. The matter should have been left to the Board for determination by it prior to formulating its order and should not be left for possible final settlement in contempt proceedings.

*Sixth.* Other minor objections to the Board's order were found without substance below. After careful consideration we agree with this disposition of these questions, and do not feel that further discussion is required.

The decree below should be modified in accordance with this opinion, remanding to the Board the two matters discussed under *Fourth* and *Fifth* herein, for the Board's determination of these issues.

*Modified.*

MR. JUSTICE ROBERTS took no part in the consideration or disposition of the case.

MR. JUSTICE MURPHY:

While I fully approve the disposition of the first three issues in the opinion just announced, I cannot assent to the modification of that part of the Board's order

which required reinstatement of certain employees, or to the limitation imposed on the Board's power to make back pay awards.

*First.* The Board is now directed to reconsider its order of reinstatement merely because, in the course of its recital, it stated that even if the employees in question had secured other substantially equivalent employment it would nevertheless order their reinstatement for the reasons set forth in Matter of Eagle-Picher Mining & Smelting Co., 16 N. L. R. B. 727.[1] There is neither claim nor evidence that reinstatement will not effectuate the policies of the Act. There is no suggestion that the order the Board issued was wrong or beyond its power. That order is challenged only because the statement and reference to the Eagle-Picher case are said to

---

[1] The entire paragraph in which this statement appears reads: "We have found that the respondent has discriminated in regard to hire and tenure of employment of certain individuals named above. In accordance with our usual practice we shall order the reinstatement or the reëmployment of such individuals. The respondent contends that the Board lacks power to order the reinstatement of any striker who has obtained other regular and substantially equivalent employment. We have found that none of the strikers discriminated against has obtained other regular and substantially equivalent employment within the meaning of the Act. Nevertheless, even if any striker had obtained such employment, we would, for the reasons set forth in Matter of Eagle-Picher Mining & Smelting Co., . . . still order his reinstatement by the respondent." 19 N. L. R. B. 547, 598.

It is to be noted, of course, that in the Eagle-Picher case the Board's remarks were made in answer to the argument advanced here, that § 2 (3) narrows the application of the term "employees" in § 10 (c).

It is worth noting, too, that in that case the Board stated: "Further to effectuate the purposes and policies of the Act, and as a means of removing and avoiding the consequences of the respondents' unfair labor practices, we shall, in aid of our cease and desist order, order the respondents to take certain affirmative action, more particularly described below." 16 N. L. R. B. 727, 831.

demonstrate that the Board ordered reinstatement mechanically due to a misconception of its functions under the statute, and that it did not consider whether reinstatement would effectuate the policies of the Act.

Even if it be assumed that this recital imports an inaccurate appraisal of the Board's power, an assumption which I believe is without justification, modification of its order is not a necessary consequence. The question before us is whether the order the Board issued was within its power. There is no occasion now to determine what disposition should be made of an order which was not an exercise of the Board's administrative discretion, or to infer that the Board must investigate the substantial equivalency of other employment before it may order reinstatement. Suffice to say, the Board found that certain employees had been the objects of unfair labor practices and that it would effectuate the policies of the Act to order their reinstatement. It expressly rested its order upon those findings.

The circumstances occasioning the latter finding are convincing evidence that the Board not only was required to but did exercise discretion in the formulation of its order of reinstatement. Throughout the hearing the employer's counsel sought to show by cross-examining them that the complaining employees were not entitled to reinstatement. Shortly after that examination commenced, the trial examiner requested the Board's attorney to state the theory upon which he contended that those employees should be reinstated. Considerable testimony was offered to show the working conditions, hours, rates of pay, continuity of operation, etc., of mines in which the witnesses had secured other employment.

All this was in the record certified to the Board. Accompanying it was the contention of the employer that reinstatement should be denied for various reasons. The

Board explicitly considered the contention, among others, that reinstatement would provoke further disputes and discord among the employees rather than promote labor peace. It also considered the contention that many of the employees had obtained other substantially equivalent employment, making both general and specific findings concerning it.[2] Finally, it concluded that the policies of the Act would be effectuated by ordering the employer to tender reinstatement to designated employees.

That its order of reinstatement was more than a perfunctory exercise of power is pointedly manifest from the Board's own statements. Answering the employer's contention that reinstatement might foster discord among the employees, the Board declared: "We cannot but consider the difficulties of adjustment envisaged in the foregoing testimony [upon which the employer relied] as conjectural and insubstantial, especially in view of the lapse of time since the strike. However, even assuming that the asserted resentment of nonstrikers towards strikers and picketers persists, *the effectuation of the policies of the Act patently requires*[3] the restoration of the strikers and picketers to their *status quo* before the discrimination against them."

In discussing its proposed order, the Board said: "Having found that the respondent has engaged in unfair labor practices, we will order it to cease and desist therefrom and to take certain affirmative action *designed to effectuate the policies of the Act*[4] and to restore as nearly

---

[2] The Board found that none of the employees had obtained other substantially equivalent employment. The Circuit Court of Appeals reversed this finding in part. The reversal is not challenged here, but that is immaterial since the Court now decides that the Board has the power to order reinstatement even though the employees have found other substantially equivalent employment, provided that the policies of the Act will be effectuated.

[3] Emphasis added.

[4] Emphasis added.

as possible the condition which existed prior to the commission of the unfair labor practices."

And in its formal order, the Board stated: "Upon the basis of the above findings of fact and conclusions of law, and pursuant to Section 10 (c) of the National Labor Relations Act, the National Labor Relations Board hereby orders that the respondent, Phelps Dodge Corporation . . . shall: . . . 2. Take the following affirmative action *which the Board finds will effectuate the policies of the Act*:[5] (a) Offer to the following persons immediate and full reinstatement to their former or substantially equivalent positions . . .; (b) Make whole [the following employees] for any loss of pay they may have suffered by reason of the respondent's discriminatory refusal to reinstate them . . . less the net earnings of each . . ."

The italicized phrases in these quotations were not chance or formal recitals. They expressed in summary a considered exercise of administrative discretion. The Board carefully followed the precise procedure which this Court says it should have adopted. It found that the employees in question had been the victims of unfair labor practices. It also found that the policies of the Act would be effectuated by ordering their reinstatement. Since there was evidence to support these findings, it is difficult to understand what more the Board should or could have done.

But if we are now to consider in the abstract whether the Board properly opined that it might have the power to order reinstatement without regard to the substantial equivalency of other employment, I am nevertheless unable to approve the modification of its order, or to accept the inference that the Board must consider the substantial equivalency of other employment before it may order reinstatement. There is nothing in § 10 (c) or in the Act

---

[5] Emphasis added.

as a whole which expressly or impliedly obligates the Board to consider the substantial equivalency of other employment or to make findings concerning it before it may order reinstatement. Indeed, such a rule narrows rather than broadens the administrative discretion which the Act confers on the Board.

Practical administrative experience may convince the Board that the self-interest of the employee is a far better gauge of the substantial equivalency of his other employment than any extended factual inquiry of its own. Conversely, the Board may conclude that the policies of the Act are best effectuated by an investigation in every case into the nature of his other employment. That choice of rules is an exercise of discretion which Congress has entrusted to the Board. Whichever rule the Board adopts, it does not follow that reinstatement becomes a remedy which is granted automatically upon a finding of unfair labor practices. If for other reasons the Board finds that the policies of the Act will not be effectuated, of course it not only could but should decline to order an offer of reinstatement. Compare Matter of Thompson Cabinet Co., 11 N. L. R. B. 1106.

*Second.* As already indicated, I am unable to accept the limitation now imposed on the Board's power to make back pay awards. Again the question is simply this: Was the back pay order within the power of the Board and supported by evidence? What order the Board should have made or what rule of law it should have followed if some of the employees had "willfully incurred" losses are questions of importance which we should answer only when they are presented. They are not here now.

The Board expressly found that the policies of the Act would be effectuated by ordering the employer to make whole those employees who had been the victims of discriminatory practices. We are pointed to nothing which requires a different conclusion. We are not referred to

any employee who "willfully incurred" losses, or to any evidence in the record compelling us to hold that any of them did. At most the record shows only that some of the employees obtained other employment—which was not substantially equivalent—and then voluntarily relinquished it. For all we know, the Board could have determined that this evidence did not establish "willfully incurred" losses. Plainly that was a permissible inference from the evidence, and, this being so, there is no occasion now to decide what the Board should have done had it drawn some other inference.

But again, if we are now to rule on the abstract issue, I cannot agree that the power to make back pay awards must be fettered in the manner described in the opinion just announced. For if the Board has no choice but to accept the limitation now imposed, its administrative discretion is curbed by the very decision which purports to leave it untouched.

It must be conceded that nothing in the Act requires such a limitation in so many words. To be sure, nothing in the Act requires a back pay award to be diminished by the amounts actually earned (compare *Republic Steel Corp.* v. *Labor Board,* 311 U. S. 7), but that should admonish us to hesitate before we introduce yet another modification which Congress has not seen fit to enact, especially when the two situations differ in many respects. It is not our function to read the Act as we think it should have been written, or to supplant a rule adopted by the Board with one which we believe is better. Our only office is to determine whether the rule chosen, tested in the light of statutory standards, was within the permissible range of the Board's discretion.

The Board might properly conclude that the policies of the Act would best be effectuated by refusing to embark on the inquiry whether the employees had willfully incurred losses. Administrative difficulties engendered

by a contrary rule would be infinite, particularly as the number of individuals involved in the dispute increased. Underlying the contrary rule is the supposition that the employee would purposely remain idle awaiting his back pay award. But that attributes to the employee an omniscience frequently not given to members of the legal profession. He must be able to determine that the employer actually has committed unfair labor practices; that the unfair labor practices affect commerce within the meaning of §§ 2 (6) and 2 (7); that the Board will take favorable action and make a back pay award; that the Circuit Court of Appeals will enforce that order in full; and that this Court finally will affirm if the case comes here.

This is not all. He must have capital sufficient to provide for himself and for any dependents while he awaits the back pay award, even though that may not come until several years later.[6] He must risk union disfavor by dividing his efforts between a labor dispute and a search for a new job. He must realize, although his natural suppositions are otherwise, that he will probably not endanger seniority rights or chance of reinstatement by accepting other employment. He must be able to decide when he has made sufficient efforts to secure other employment notwithstanding that he is not told whether he can or must accept any job no matter where it is or what type of employment, wages, hours, or working conditions.

At his peril he must determine all these things because conventional common law concepts and doctrines of damages, applicable in suits to enforce purely private rights, are to be imported into the National Labor Relations Act.

---

[6] The labor dispute which gave rise to this proceeding occurred in 1935.

Having these considerations in mind, supplemented perhaps by others not available or suggested to us, the Board might well decide that the rule disapproved here would best effectuate the policies of the Act. I do not think we should substitute our judgment on this issue for that of the Board.

Accordingly, I would affirm the order of the Board in full.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur in this opinion.

MR. JUSTICE STONE:

With two rulings of the Court's opinion the CHIEF JUSTICE and I are unable to agree.

Congress has, we think, by the terms of the Act, excluded from the Board's power to reinstate wrongfully discharged employees, any authority to reinstate those who have "obtained any other regular and substantially equivalent employment." And we are not persuaded that Congress, by granting to the Board, by § 10 (c) of the Act, authority "to take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of the Act," has also authorized it to order the employer to hire applicants for work who have never been in his employ or to compel him to give them "back pay" for any period whatever.

The authority of the Board to take affirmative action by way of reinstatement of employees is not to be read as conferring upon it power to take any measures, however drastic, which it conceives will effectuate the policies of the Act. We have held that the provision is remedial, not punitive, *Consolidated Edison Co.* v. *Labor Board*, 305 U. S. 197, 235, 236; see also *Labor Board* v. *Pennsylvania Greyhound Lines*, 303 U. S. 261, 267, 268,

and that its purpose is to effectuate the policies of the Act by achieving the "remedial objectives which the Act sets forth" and "to restore and make whole employees who have been discharged in violation of the Act." *Republic Steel Corp.* v. *Labor Board*, 311 U. S. 7, 12. The Act itself has emphasized this purpose when, in including in the category of "employees" those who might not otherwise have been so included, it provided, § 2 (3), that the term "employee" "shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment."

While the stated policy of a statute is an important factor in interpreting its command, we cannot ignore the words of the command in ascertaining its policy. In, enlarging the category of "employees" to include wrongfully discharged employees and at the same time excluding from it those who have obtained "other regular and substantially equivalent employment," the Congress adopted a policy which it may well have thought would further the cause of industrial peace quite as much as the enforced employment of discharged employees where there was no occasion to compensate them for the loss of their employment. It is the policy of the Act and not the Board's policy which is to be effectuated, and in the face of so explicit a restriction of the definition of discharged employees to those who have not procured equivalent employment, we can only conclude that Congress has adopted the policy of restricting the authorized "reinstatement of employees" to that class.

Even if we read the language of § 2 (3) distributively, it seems difficult to say that the specially granted power to reinstate employees extends to those who, by definition, are not employees, and this is the more so when the effect of the definition is consonant with what appears

to be the declared purpose of the reinstatement provision. Nor can it fairly be said that the definition of employees is of significance only for the purpose of determining the appropriate bargaining agency of the employees. There is no evidence in the statute itself, or to be derived from its legislative history, that the definition was not to be applied in the one case quite as much as in the other. Certainly the fact of substantially equivalent employment has as much bearing upon making the discharged employee whole as upon his right to participate in the choice of a bargaining representative, and no ground has been advanced for saying that it applies to one and not the other.

As a majority of the Court is of opinion that the Board does possess the power to order reinstatement even though the discharged employees had obtained other equivalent employment, we agree that the case should now be remanded to the Board for a determination of the question whether reinstatement here would further the policies of the Act.

We agree that petitioner's refusal to hire two applicants for jobs, because of their union membership, was an unfair labor practice within the meaning of § 8 (3) of the Act, even though they had never been employees of the petitioner, and that under § 9 (c) the Board was authorized to order petitioner to cease and desist from the practice and to take appropriate proceedings under § 10 to enforce its order. But it is quite another matter to say that Congress has also authorized the Board to order the employer to hire applicants for work who have never been in his employ and to compel him to give them "back pay."

The Congressional debates and committee reports give no hint that, in enacting the National Labor Relations Act, Congress or any member of it thought it was giving the Board a remedial power which few courts had ever

assumed to exercise or had been thought to possess, and we are unable to say that the words of the statute go so far. The authority given to the Board by § 10 (c) is, as we have said, not an unrestricted power, and the grant is not to be read as though the words "including reinstatement of employees with or without back pay" were no part of the statute. None of the words of a statute are to be disregarded and it cannot be assumed that the introduction of the phrase in this one was without a purpose.

Undoubtedly, the word "including" may preface an illustrative example of a general power already granted, *Helvering* v. *Morgan's, Inc.*, 293 U. S. 121, 125, or it may serve to define that power or even enlarge it. Cf. *Montello Salt Co.* v. *Utah*, 221 U. S. 452, 462, *et seq.* Whether it is the one or another must be determined by the purpose of the Act, to be ascertained in the light of the context, the legislative history, and the subject matter to which the statute is to be applied.

In view of the traditional reluctance of courts to compel the performance of personal service contracts, it seems at least doubtful whether an authority to the Board to take affirmative action could, without more, fairly be construed as permitting it to take a kind of affirmative action which had very generally been thought to be beyond the power of courts. This is the more so because the Board's orders were by § 10 (c) made subject to review and modification of the courts without any specified restriction upon the exercise of that authority.

It is true that in *Texas & N. O. R. Co.* v. *Railway Clerks,* 281 U. S. 548, this Court had held that upon contempt proceedings for violation of a decree enjoining coercive measures by the employer against his union employees, a court could properly direct that the contempt be purged on condition that the employer restore the status quo. But Congress in enacting the National

Labor Relations Act took a step further by providing that the Board could order reinstatement of employees even though there had been no violation of any previous order of the Board or of a court. It thus removed the doubt which would otherwise have arisen by defining and, as we think, enlarging the Board's authority to take affirmative action so as to include the power to order "reinstatement" of employees. But an authority to order reinstatement is not an authority to compel the employer to instate as his employees those whom he has never employed, and an authority to award "back pay" to reinstated employees is not an authority to compel payment of wages to applicants for employment whom the employer was never bound to hire.

Authority for so unprecedented an exercise of power is not lightly to be inferred. In view of the use of the phrase "including reinstatement of employees," as a definition and enlargement, as we think it is, of the authority of the Board to take affirmative action, we cannot infer from it a Congressional purpose to authorize the Board to order compulsory employment and wage payments not embraced in its terms.