**SARKES TARZIAN, INC.,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

No. 15757.

United States Court of Appeals
Seventh Circuit.

Feb. 27, 1967.

Rehearing Denied April 6, 1967.

John F. McClure, Chicago, Ill., Joseph Alton Jenkins, Dallas, Tex., D. C. Duck, Douglas J. Hill, Cadick, Burns, Duck & Neighbours, Indianapolis, Ind., Joseph

Alton Jenkins & Associates, Dallas, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Charles N. Steele, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., for respondent.

Before CASTLE, SWYGERT, and CUMMINGS, Circuit Judges.

SWYGERT, Circuit Judge.

Sarkes Tarzian, Inc. petitions for review of an order of the National Labor Relations Board; the Board cross-petitions for enforcement of its order.[1] The order resulted from the Board's findings that the company violated section 8(a) (1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a) (1) and (3), by certain conduct occurring both prior and subsequent to an employee representation election held at the company's plants in the Bloomington, Indiana area in January 1963.

■ The company manufactures electronic equipment, employing in excess of two thousand production and maintenance workers. During 1962 the union [2] attempted to organize these employees. The union filed a representation petition in October 1962, and an election was held which the union lost. The union continued its organizational activities after the election. It also filed timely objections to the election results and charges of unfair labor practices against the company with the Board. The objections and charges were consolidated for hearing, but only the unfair labor practices found by the Board are before us in this review.[3]

The Board found that the company violated section 8(a) (1) by questioning employees about their membership in the union, by threatening employees with discharge and other reprisal for union

activity, and by soliciting and encouraging employees to engage in surveillance of union activities and to participate in antiunion conduct. The Board also found that the company violated section 8(a) (3) as well as section 8(a) (1) by discharging employee Melville Wilber for his union membership and by refusing to rehire former employee Hattie Logie unless she accepted a job screening employment applicants concerning their union activities. The Board's order requires the company to desist from the unfair labor practices found and, affirmatively, to offer Wilber and Logie employment in their former (or substantially similar) jobs and to compensate them for wages lost because of the company's discriminatory conduct.

■ The company's principal attack upon the substantiality of the evidence to support the Board's findings is directed against the credibility resolutions of the Board's trial examiner. After considering the record as a whole we have concluded that it presents no exceptional circumstances which would make inapplicable the rule that the Board's action in crediting and discrediting witnesses will not ordinarily be disturbed on review. Our discussion of the evidence will be limited accordingly.

*Violations of section 8(a) (1)*

■ The Board's findings that the company committed several violations of section 8(a) (1) are fully supported by the record. A brief résumé of the company's course of conduct with respect to employees Leola Hostetter and Hattie Logie is sufficient to illustrate that the company engaged in proscribed activities in venting its hostility to union representation of its employees.

Leola Hostetter was active in an employee group opposing the union. She was asked by the plant manager to check a list of "group leaders" in the plant and

---

1. The Board's decision and order (as modi-, fied June 22, 1966) are reported at 157 N.L.R.B. No. 96 (March 26, 1966).

2. International Brotherhood of Electrical Workers, AFL-CIO.

3. The Board's action in setting aside the election and directing that a new election be held is not a final reviewable order.

to indicate those who were prounion and antiunion. Later, the company president's wife, who assumed an active role in management, told the plant manager that employees who were "disloyal" because of their union sympathies were not to be promoted to the position of group leader. Shortly before the election the company's general counsel asked Hostetter to listen to the conversation of the women employees in the restroom and to report back their feelings about the forthcoming election. Hostetter made many such reports to the general counsel and to Mrs. Tarzian, the president's wife. Mrs. Tarzian also requested Hostetter to give antiunion speeches at employee meetings arranged and conducted by the company's management. Hostetter made at least two such speeches. Finally, Hostetter was authorized to use materials from the company's supplies to make antiunion signs and badges. Just before the election the company's general counsel asked Hostetter to have some tags printed which read "Vote No" and to pass them out to the employees. Hostetter complied with the request and was later reimbursed by the general counsel for the printing charge.

Employee Hattie Logie was also enlisted in the company's campaign to defeat the union. Initially, Logie was a member of the union's organizing committee. After twice threatening Logie with discharge for absenteeism, her foreman suggested that the "company could do more for [her] than what the union was doing, and then the company would have no reason to fire [her]." Following this incident, Logie told an interviewer in the company's personnel office that she wanted to switch "from being for the union to being for the company." When this statement was repeated to the company president, Tarzian, he told Logie that he "would guard [her] night and day, if necessary, and he would spare no expense to guard [her] against the damn Communists." Thereafter, it was agreed that if Logie remained openly for the union but spied on its activities, the company would secure a job for her in

Yakima, Washington, where she wanted to go. In addition, the company began making periodic payments to Logie, ranging from five to sixty dollars, which continued throughout the period of her collaboration with the company.

Logie's espionage activities, which began before the election, continued for approximately one year after the election. Under instructions from the company, she attended union meetings and reported back as to the union's activities. She signed an authorization card, obtained signatures on cards from employees she was rather certain supported the union, and displayed the cards to company officials before returning them to union headquarters. She met surreptitiously with company representatives in the general counsel's home and reported on her surveillance activities. Later, the company paid for the installation of a private unlisted telephone in Logie's home so that she could report her experiences more readily. Eventually, Logie was able to persuade company officials that her spying activities were becoming too risky, and in February 1964 the company contributed substantially toward the expenses incurred in moving her from Bloomington, Indiana to California.

We think the evidence relating to employees Hostetter and Logie itself amply justifies the Board's findings and order as to the company's violations of section 8(a) (1) of the act. For this reason, other company conduct cited by the Board in support of its position does not require discussion.

*Violation of section 8(a) (1) and (3); discharge of Melville Wilber*

██ Melville Wilber was a member of the union organizing committee and actively solicited union membership. Company supervisory personnel were aware of this. Shortly after he was warned by his foreman not to speak in support of the union because he was being "watched," and shortly after the union filed its representation petition, Wilber was discharged. The stated reason for the discharge was that Wilber violated a

company rule against punching another employee's timecard. On October 16, 1962, Wilber punched his mother's timecard after his mother returned home to retrieve forgotten dentures. Wilber's mother returned to the plant a few minutes after the 7 a. m. starting time, but no loss of production occurred. Wilber was discharged later the same day.

Wilber had a nine-year employment record free of complaints about his work or conduct. Several other employees had punched timecards of fellow employees during the period prior to Wilber's discharge without being disciplined therefor, despite an admitted company rule against such conduct.[4] Under the circumstances of Wilber's summary discharge, and against the background of the company's intense hostility toward the union, the Board was justified in inferring that Wilber's discharge was motivated by his union activity and that his violation of the company rule was a pretext for discriminatory action.

*Violation of section 8(a) (1) and (3); refusal to rehire Hattie Logie*

■ In June 1964, four months after the company assisted her in moving to California,[5] employee Hattie Logie returned to Bloomington. She immediately telephoned the company's general counsel and requested employment in the quality control department where she had worked previously. Without indicating the availability of such a position, the general counsel offered Logie a job in the personnel office screening applicants for employment concerning their union sympathies, a job Logie had once refused during her tenure as a company spy. When she refused the offer, Logie was told that she had better "go to work over at RCA." A few days later Logie submitted a formal application for a po-

sition in the quality control department, but the company never tendered further employment.

■■ On these facts the Board could find that the company violated the prohibition of section 8(a) (3) against discouraging union membership "by discrimination in regard to hire * * * or any term or condition of employment". The violation consisted of attaching the discriminatory condition of union surveillance to the tender of employment. Logie was thereby denied her statutory right "to be considered for employment on a nondiscriminatory basis." NLRB v. Lummus Co., 210 F.2d 377, 381 (5th Cir. 1954). The company notes that Logie had terminated her employment with the company and had no legal right to be rehired. It argues that for this reason no violation of section 8(a) (3) occurred, since the Board did not find that a job of the kind sought by Logie was available at the time of her application. We agree with the Board, however, that the violation occurred when Logie's application was acted upon in a discriminatory fashion. The availability of a job for which Logie was qualified and had applied was necessary for the Board's consideration only in relation to the remedy which would best effectuate the policy underlying the act. In this regard, the Board's modified order provides that Logie shall be offered employment "in the same or substantially equivalent position at which she would have been employed absent the discrimination against her if such position became available subsequent to her * * application for reemployment, or as soon hereafter as it becomes available." Such a remedy is within the Board's discretion. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

The Board's order will be enforced.

---

4. At the hearing, the company referred to three instances where employees were discharged for violation of this rule, but evidence was introduced only as to one employee. This employee, discharged for punching another employee's timecard in 1953, had received a prior warning for a violation of company rules. The same employee was rehired by the company in 1955.

5. The company offered Logie employment in its California plant during her stay there, but the offer was not accepted.