378 F.2d 259
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CAMPBELL SOUP COMPANY and Butchers Union Local 127, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, Respondents.
 No. 21297.
 United States Court of Appeals Ninth Circuit.
 May 23, 1967.
 
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, H. M. Levy, Marsha Swiss, Attys., N. L. R. B., Washington, D. C., Roy O. Hoffman, Director, N. L. R. B., San Francisco, Cal., for appellant.
 Charles P. Scully, Donald C. Carroll, San Francisco, Cal., for appellee Butchers Union Local 127.
 Douglas H. Springer, W. L. White, Jr., Camden, N. J., Gilford G. Rowland, Rowland, Paras & Clowdus, Sacramento, Cal., for appellee Campbell Soup Co.
 Before MERRILL and BROWNING, Circuit Judges, and TAYLOR, District Judge.
 MERRILL, Circuit Judge.
 
 
 1
 This case is before the court upon petition of the National Labor Relations Board to enforce its order issued against respondents on June 16, 1965, following proceedings under § 10(c) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. The Board's decision and order are reported at 152 N.L. R.B. 1645 (1965).
 
 
 2
 The Board found that respondent company, by requiring newly hired employees to join respondent union immediately, as a condition of employment, by furnishing new employees with union cards, by deducting union dues and initiation fees from the employees' pay during the first thirty days of employment[1] and forwarding these deductions to the union, thereby assisted the union in violation of § 8(a) (2) and (1) of the Act. The Board found that the company and the union, by jointly engaging in a practice whereby newly hired employees were required to join the union and pay union dues and initiation fees during the first thirty days of employment, violated § 8(a) (1), (2) and (3), and § 8(b) (2) and (1) (A) of the Act.
 
 
 3
 The Board's order directs respondents to cease and desist from checking off union dues for employees pursuant to membership dues checkoff authorizations, unlawfully obtained from the employees prior to the thirty-day statutory period, and from in any like or related manner interfering with employees in the exercise of their § 7 rights, and to post the usual notices. The Board further ordered respondents, jointly and severally, to reimburse all employees hired within six months[2] prior to the time the charge was filed in this case for their first month's dues, and to reimburse those employees who, during the same period, paid initiation fees but worked less than thirty days for the initiation fees so deducted.
 
 
 4
 The union challenges the Board's finding of an unfair labor practice, asserting that the newly hired employees voluntarily joined. In our judgment the Board's finding is supported by substantial evidence.
 
 
 5
 The union's main attack is upon the Board's order that reimbursement apply to all employees hired within the time limits specified in the order. It contends that the remedy of reimbursement should be limited to the one employee who filed the unfair labor practice charge with the Board.
 
 
 6
 The union first contends that the charges filed were not broad enough to encompass any conduct other than that which occurred in the case of the charging individual. We do not so read the charges. They were that "Madeline Ritchey and others" had been "required" or "caused" to become members of the union as a condition of employment, and that "by these and other acts" respondents had "coerced and restrained employees" in violation of § 7 of the Act.
 
 
 7
 The union's principal contention is that the order is contrary to an agreement of settlement reached by the Board and the union, which limited reimbursement to Madeline Ritchey. There is no question but that such was the nature of the agreement as proposed by the Board's field examiner and acceded to by the union, and that this proposal was the express subject of an exchange of correspondence. The trial examiner found that an agreement had been reached.
 
 
 8
 The Board's ruling to the contrary was based upon the fact that the agreement had not been approved in writing by the Board's regional director, but instead had been rejected by him for the reason that without extending reimbursement to all those ultimately covered by the Board's order, a complete remedy for the unfair labor practice would not be provided.
 
 
 9
 The field examiner, in forwarding a copy of his proposed settlement agreement, had stated that it was being recommended by him "subject to the approval of the regional director." Settlement agreements are the subject of NLRB Statement of Procedure § 101.7, which expressly states that agreements are "subject to the approval of the regional director."
 
 
 10
 The union vigorously contends that it is unwise to stand upon the requirement of approval and to construe that requirement as for approval in writing. It echoes the views of the trial examiner, who ruled that the proposed agreement should bind the Board; he reasoned that a contrary rule would impart an undesirable degree of uncertainty to settlement negotiations and discourage negotiation in the field.
 
 
 11
 The Board, however, found other considerations to be more impelling. It stated:
 
 
 12
 "We reject the trial examiner's conclusion that there are `any number of ways' in which the regional director can give his approval to a settlement agreement. In our opinion it is necessary that the regional director expressly approve in writing the offered settlement in its totality after all disputed issues are resolved. Anything short of this position opens the door to possible confusion and misunderstanding as to whether or not a settlement has been effectuated, as in the instant case."
 
 
 13
 Such policy decisions clearly are within the broad discretion of the Board.[3] The question here relates to the wisdom of the rule in the public interest rather than to the injustice of strict construction in a particular case. Further we do not find here a completely arbitrary departure from settled administrative practice, such as has been felt to warrant judicial intervention. Cf., Sunbeam Television Corp. v. FCC, 100 U.S. App.D.C. 82, 243 F.2d 26 (D.C.Cir. 1957).[4]
 
 
 14
 The company attack on the Board's order is directed to the fact that the company has been made responsible for reimbursement jointly and severally with the union. It should instead, it contends, have been made secondarily responsible. The present order, it asserts, may well result in unjust enrichment of the union, and to permit the union thus to enrich itself can hardly be said to accomplish the purposes of the Act.
 
 
 15
 We are not unsympathetic with the company's position and certainly the Board could have provided secondary responsibility had it so chosen. The choice, however, remains that of the Board, and it is clear that the choice of joint and several liability is available to the Board when both the union and the employer had engaged in the discriminatory practice. NLRB v. Newspaper and Mail Deliverers Union, 192 F.2d 654 (2d Cir. 1951); Union Starch and Refining Company v. NLRB, 186 F.2d 1008, 27 A.L.R. 2d 629 (7th Cir. 1951), cert. denied, 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617 (1951); also cf., NLRB v. Pinkerton's National Detective Agency, 202 F.2d 230 (9th Cir. 1953). We would have a different case if the company had strongly resisted the imposition of this practice by the union. See NLRB v. Lexington Elec. Products Co., 283 F.2d 54 (3d Cir. 1960).
 
 
 16
 The order is entitled to enforcement. So ordered.
 
 
 
 Notes:
 
 
 [1]
 § 8(a) (3) permits an employer, pursuant to agreement with a union, to require union membership "after the thirtieth day following the beginning of such employment."
 
 
 [2]
 29 U.S.C. § 160(b) (1964) precludes a Board complaint "based upon any unfair labor practice occurring more than six months prior to the filing of the charge * * *."
 
 
 [3]
 "Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941)
 
 
 [4]
 The Board itself, in past cases, has recognized the policy considerations noted by the trial examiner, but the force given to them has depended on the circumstances of the particular case. Sherry & Gordon Co., 107 N.L.R.B. 113 (1953); see also United Dairy Co., 146 N.L.R.B. 187 (1964); Tomkin Motor Lines, Inc., 142 N.L.R.B. 1 (1963); Jackson Mfg. Co., 129 N.L.R.B. 460 (1960); Corn Products Refining Co., 22 N.L.R.B. 824 (1940); Wickwire Bros., 16 N.L.R.B. 316 (1939); Godchaux Sugars, Inc., 12 N.L.R.B. 568 (1939); Shenandoah-Dives Mining Co., 11 N.L.R.B. 885 (1939). All prior cases are distinguishable from the case before us, and we disagree with the union's contention that there existed any established rule contrary to that here announced. Arbitrary disregard of this rule in the future would present a different question. See Burinskas v. NLRB, 123 U.S. App.D.C. 143, 357 F.2d 822 (D.C.Cir. 1966)