**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**FLITE CHIEF, INC.; Richard Miller and Karen Miller; M & M Truckadero Coffee Shop, Inc.; James Miller and Paul Minder, Respondents.**

**No. 80-7085.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 4, 1980.

Decided Feb. 23, 1981.

Richard S. Zuckerman, Washington, D. C., for petitioner.

David G. Moore, Riverside, Cal., for respondents.

OPINION

Petition for review from an Order of the National Labor Relations Board.

Before CHAMBERS and GOODWIN, Circuit Judges, and MURPHY,* District Judge.

MURPHY, District Judge:

Prior to this backpay proceeding, the Board had found that Flite Chief violated the Act by discharging all of its coffee shop employees because of their union activities. This Court ordered enforcement of the Board's order. *N.L.R.B. v. Flite Chief*, 566 F.2d 1182 (9th Cir., 1974).

The parties being unable to agree upon the amount of backpay due the discriminatees, the Regional Director instituted the instant proceeding by the issuance of a backpay specification. Flite Chief denied any liability as to discriminatee Johnson, and claimed that it owed Templeton only a fraction of what was claimed in the specification. Although other discriminatees were involved, this appeal does not concern them.

After a 3-day hearing, the Administrative Law Judge (ALJ) issued detailed findings recommending $1,080. for Johnson and $5,856. for Templeton. A panel of the Board affirmed the award to Johnson, and increased Templeton's to $23,803. This appeal followed.

*Johnson*

The only issue in Johnson was whether he was an employee at the time of the discharge, July 22, 1974. The General Counsel and Flite Chief agreed that a payroll journal did not reflect that Johnson was an employee during the week ending July 22, but Johnson offered a check stub indicating payment to him for the pay period ending July 22. In addition, there was in evidence a letter that Flite Chief had sent Johnson, as it did to all discharged employees, offering reinstatement.

We agree with the ALJ and the panel that Johnson was so employed and entitled to the backpay award of $1,080.

* Honorable Thomas F. Murphy, United States District Judge, Southern District of New York, sitting by designation.

*Templeton*

The principal issues in Templeton are (1) whether the panel was legally justified in increasing Templeton's award by 400%, and (2) whether the Regional Director's denial of Flite Chief's application for leave to take depositions of the discriminatees and their interim employers was a denial of due process.

Templeton was employed in Flite Chief's coffee shop as a cook at $4.00 an hour. He was unlawfully discharged for union activities with the other employees of the coffee shop on July 22, 1974.

On October 18, 1978, the Regional Director issued the backpay specification and notice of hearing in the present proceeding. It alleged in part that Flite Chief's net backpay liability from July 22, 1974 to September 30, 1978 in Templeton's case totaled over $32,000.* This specification was amended and reduced by counsel for the General Counsel on the morning of January 16, 1979, the first day of the scheduled backpay hearing after Templeton advised counsel that morning of additional interim earnings from four separate employers of some $8,000.

Since Flite Chief had the burden of proof, it called Templeton and examined him at length on his seven different jobs after July, 1974, including the last four at Vikings Table, Ontario Golf Club, Mountain View Country Club, and Your Host Restaurant which he had not reported to the Board's compliance officer until that morning, January 16, 1979.

The ALJ, who alone saw and heard Templeton testify (100 pages of stenographic transcript), found:

> "His testimony in response to these questions [why he failed to report these four interim earnings] was inconsistent and implausible and his demeanor was unfavorable. Based upon his failure to credi-

* Templeton, on October 18, 1978, the date of the backpay specification, had been working for Your Host as general manager since August 14, 1978 and continued until November 26, 1978.

bly and convincingly explain why he failed to inform a representative of the Board about his interim earnings with the four employers above, I find that Templeton's intent was to wilfully conceal these earnings in order to obtain more backpay than he was entitled to receive.

It is my opinion that, where a backpay claimant wilfully conceals interim employment from the Board's compliance officer with an intent to fraudulently increase issuance of a backpay specification, the claimant should be penalized by disallowing all backpay from the date the claimant was first employed by an interim employer whose earnings have been concealed until the claimant discloses these earnings to a representative of the Board. Accordingly, I shall recommend that Templeton's backpay be disallowed in its entirety from June 4, 1975, the approximate date when he began working for Vikings Table, until January 16, 1979, the date he disclosed his concealed interim earnings to a representative of the Board."

To fully understand this characterization of a witness in a judicial proceeding, it is important to recall that three of these four jobs were the last three jobs Templeton had before testifying on January 16, 1979, and covered the period of the first two quarters of 1975, the second, third and fourth quarters of 1977, and the third quarter of 1978.

The panel's rejection of such findings is phrased in the most polite language. It stated that it "has decided to affirm the rulings, findings and conclusions of the Administrative Law Judge and to adopt his recommended order as modified herein."

Adopting the arguments and exceptions of the General Counsel that since Templeton *voluntarily submitted* the *additional information* in issue [the concealed earnings of some $8,000. from four interim employers], the panel concludes, "the fact remains that Templeton came forth *voluntarily* and supplied the General Counsel, albeit at the 11th hour, with the *information* necessary to present a *more accurate picture* of his interim employment status." (Emphasis ours)

Although the panel did not condone Templeton's method of *furnishing* the Board with requisite interim employer data or his decision to forego the Board's quarterly reports procedure, it concluded "we do not equate his conduct with an attempt to 'pervert a remedial order of the Board . . . into an instrument of . . . personal gain.' The fact that Templeton *voluntarily* submitted the *missing* information convinces us that he was not seeking to obtain more than his due." (Emphasis ours)

The phrases "voluntarily submitted" and "additional information," "missing information," "more accurate picture," "his decision to forego," etc. are truly words of art, particularly in the face of the finding by the ALJ that Templeton had *wilfully understated* interim earnings to a representative of the Board for the purpose of receiving an amount of backpay in excess of the claimed actual loss, and that Templeton's testimony in explanation of his concealment of his interim employment from the Board's compliance officer until the morning of the hearing "was inconsistent and implausible and his demeanor was unfavorable."

What the panel didn't appreciate or explore, in our opinion, was the cause of Templeton's newly found religion or why, like Saul on his way to Damascus, he changed his way of life.

Like others before him, it was a simple thing. In this case it was a *subpoena duces tecum* served on Templeton shortly before the hearing date. In *Hamlet*, it was "the play's the thing wherein I'll catch the conscience of the King."

At p. 201 of the transcript, in Templeton's direct examination immediately after he had given his name and his address, these questions and answers are recorded:

"Q Were you served with a subpoena by my office to bring certain documents and records here today to this hearing?

A Yes, sir.

Q Did you bring those documents and records pursuant to that subpoena?

A Those that I have.

Q And what did you have, and would you describe what is available for my inspection, sir; just briefly.

A Paycheck stubs, W–2 forms.

Q Are some of those paycheck stubs, W–2 forms, and what have you, the materials that have been reproduced by Mr. Wheeler and Mr. Prough that are now in evidence?

A Yes, sir." [Mr. Wheeler and Mr. Prough were attorneys with the General Counsel and present at the hearing.]

In addition, Flite Chief's counsel had present in the hearing room witnesses from some of these employers, whom Templeton admitted that he knew.

It seems perfectly clear to us, as it did to the ALJ, that Templeton realized that the jig was up and that the subpoena so jolted him that he was forced to reveal the true nature of his interim employment, sacrificing the windfall he had planned and possibly avoiding jail.

It is interesting to note, also, that the ALJ accepted the testimony of the various employers who testified, and rejected Templeton's as being unworthy of belief even on such simple matters as to whether he was fired or quit.

The panel also relied on the rankest hearsay from the mouth of Templeton to state, in its opinion: "We disagree with the Administrative Law Judge's assessment of Templeton's conduct in these circumstances." [Failing to file quarterly reports with the Board's Regional Office], and supports that statement by a fn.3: "Templeton claimed that he was being harassed by Respondents, who he believed had learned of his whereabouts through the quarterly employment reports submitted to the Regional Office. The Administrative Law Judge discredited Templeton's testimony in this regard."

A reading of the hearing transcript for January 16, 1979 (pp. 236, l. 24 to 240, l. 4) would indicate to the least sophisticated person that Templeton was lying.

We reject, too, the panel's adoption of the General Counsel's argument that an affirmation of the ALJ's determination would be at odds with the overriding public policy implicit in the Act, that unlawful conduct, as committed by respondent, must be fully remedied. The major and minor premises of this syllogism are that no matter how egregious respondent's misconduct was, it may only be compelled to undo its wrong and not be penalized, because the Act is remedial and not punitive. The conclusion, however, that the ALJ has in effect imposed a penalty on Templeton which contravenes the intent of the statute is a *non sequitur*.

■ We find nothing in the Act which prohibits such recommendation of the ALJ, nor does it imply that the ALJ was in error in denying backpay for the period of Templeton's fraud, even though he called such denial a penalty. Calling it a penalty, or a remedy, or a diminution, or a set-off, or an abatement is not the test. The test is, does it effectuate the policies of the Act. The Supreme Court explained the breadth of that provision in *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177, 198, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941), when it said:

> "[W]e must avoid the rigidities of an either-or rule. The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act. And in applying its authority over back pay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress to attain just results in diverse, complicated situations."

We agree, and adopt the ALJ's explanation and reasoning for his action in disallowing any backpay for the period June 4, 1979 to January 16, 1979. Namely, that it was a salutary step in the administration of Board compliance proceedings.

Under § 10(c) of the Act, after a finding of an unfair labor practice the Board is empowered "to take such affirmative action, including reinstatement of employees *with or without backpay*, as will effectuate the policies of the Act." (Emphasis ours)

The key words in the power entrusted to the Board are "as will effectuate the policies of the Act." Compare, the Supreme Court's analysis of backpay awards under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, which was modeled on the N.L.R.A. backpay provision, in *Albemarle Paper Co., et al. v. Moody, et al.*, 422 U.S. 405, 421–25, 95 S.Ct. 2362, 2373–75, 45 L.Ed.2d 280 (1975), together with Mr. Justice Rehnquist's analysis at 443–47, 95 S.Ct. at 2385–87.

We are satisfied that the panel's quadrupling of the award to Templeton from $5,856. to $23,803. is a patent attempt to achieve ends other than those that can be fairly said to effectuate the policies of the Act. It rewards a discriminatee for his perfidy as opposed to discouraging such claimants from perverting an order issued in their and the public interest into a scheme for unjustifiable personal gain.

*Due Process*

It is not contested that Flite Chief applied to the Regional Director for leave to take depositions of the discriminatees and the interim employers. The parties seem to agree that the Act does not specifically authorize or require the Board to adopt discovery proceedings. Whether the same applies to a backpay proceeding, we leave to another day, *cf., Deering Milliken, Inc. v. Nash,* Lab. Cas. 1976, ¶ 11,182–20,047 (D.C. S.C.1975).

We are satisfied that Flite Chief suffered no prejudice by the denial, since the backpay hearing was adjourned for three weeks to permit Flite Chief to interview all of the previously undisclosed interim employers and call them as witnesses.

The order of the Board will be enforced as rendered, except Templeton's award will be for only $5,856.