894 F.2d 1336
 134 L.R.R.M. (BNA) 2840
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James BROWN, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
City Disposal Systems, Inc., Intervenor.
 No. 89-5396.
 United States Court of Appeals, Sixth Circuit.
 Feb. 5, 1990.
 
 Before MILBURN and ALAN E. NORRIS, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 James Brown petitions to set aside an order of the NLRB determining the amount of back pay to be paid to him because of his wrongful discharge by his former employer, intervenor City Disposal Systems, Inc. ("City Disposal"). For the reasons that follow, Brown's petition is denied.
 
 I.
 A.
 
 2
 On May 14, 1979, Brown was discharged by his employer, City Disposal. He filed unfair labor practice charges with the NLRB. The NLRB determined that Brown had been discharged for engaging in protected concerted activity and ordered that City Disposal offer him reinstatement and make him whole. We refused to order enforcement of the Board's order, but upon our being reversed by the Supreme Court, we ordered enforcement in City Disposal Systems, Inc. v. NLRB, 766 F.2d 969 (6th Cir.1985) (per curiam).
 
 
 3
 City Disposal offered Brown reinstatement on July 18, 1985, and subsequent proceedings were held to determine the back pay owed to Brown. In a supplemental decision dated July 14, 1987, an ALJ determined that for certain periods of time Brown had incurred a willful loss of earnings, had intentionally concealed earnings, and had been physically disabled. The ALJ set Brown's back pay accordingly, but the back pay award did not include pension and health benefits.
 
 
 4
 On January 11, 1988, Brown filed exceptions to the back pay determination, but he did not raise the issue of pension and health benefits. Finally, on February 4, 1988, Brown made an untimely motion to remand for consideration of pension and health benefits. On July 29, 1988, the Board denied the untimely motion to remand and, with minor exceptions, affirmed the ALJ's findings.
 
 
 5
 Thereafter, when City Disposal tendered a check to Brown for $7,505.38, the back pay amount ordered by the Board, Brown refused to accept the check, stating an intention to seek review by this court. The Board petitioned for enforcement of its order on February 6, 1989, under docket number 89-5121. The NLRB and City Disposal agreed to the entry of a judgment, and on April 18, 1989, we ordered City Disposal to comply with the NLRB's order.
 
 
 6
 In the meantime, on April 5, 1989, Brown filed a pro se motion to intervene and oppose the consent judgment along with a petition to set aside the order of the NLRB. His motion to intervene was denied,[1] but his petition to set aside the order is before us.[2] On May 4, 1989, City Disposal was granted leave to intervene in support of the NLRB's position.
 
 B.
 
 7
 The back pay proceeding began with Mr. Canfield entering an appearance for the General Counsel of the NLRB, Mr. Opperwall entering an appearance for City Disposal, and Mr. Brown entering an appearance in his own behalf. The evidence was directed at Brown's employment record between the dates of May 14, 1989, when Brown was discharged and July 18, 1985, when he was offered reinstatement.
 
 1. Credibility
 
 8
 The ALJ found that Brown had "little regard for the truth and sanctity of an oath" and proceeded to discredit Brown's testimony on several points. The record reveals several instances of untruthful conduct by Brown including falsified employment applications, falsified tax returns, false statements under oath regarding his job search activities and the use of the alias, "James Hunter," in conjunction with his use of his deceased mother's social security number. Brown does not seriously challenge the ALJ's finding in regard to his credibility.
 
 2. Best Wrecking Job Offer
 
 9
 The ALJ found that "Brown was offered a truck driver position with Best Wrecking Company, Inc." A letter dated May 30, 1986, from the General Counsel's office to City Disposal and Brown stated:
 
 Gentlemen:
 
 10
 Based upon the presentation of substantial evidence regarding interim earnings and interim expenses applicable to the back pay period from the third quarter, 1980 through the 1st quarter, 1982 and regarding an offer of interim employment made by Best Wrecking Company and rejected by discriminatee James Brown in around May, 1979, thereby rendering discriminatee James Brown ineligible for back pay until on or about April, 1980, when he secured employment at Plymouth Hill Mobile Court, at the hearing in this matter, I intend to move to amend the back pay specification which issued in this matter on December 6, 1985....
 
 
 11
 Please let me know as soon as possible if you have any objections to this proposal amendment.
 
 
 12
 J.A.(Supp.) at 30.
 
 
 13
 In conformity with his letter, Canfield conceded at the hearing that the offer was made and rejected. Tr., Vol. III at 324. Brown denied that he had been offered the job[3] and claimed that he was not qualified to drive Best's equipment. However, David Mardigian, part-owner of Best, testified that he had observed Brown operating equipment similar to Best's equipment. The ALJ credited Mardigian's testimony and refused to credit Brown's claims that he was not qualified to operate the equipment.
 
 
 14
 Mardigian also testified that Teamster's Local 247 (the same union which represented City Disposal drivers) represented Best's drivers. Mardigian indicated that his drivers worked less hours than City Disposal drivers but earned four to five dollars more per hour. Mardigian admitted to a high turnover rate which he said was typical of the industry, but Mardigian said that three of his drivers had worked for him for a number of years. In early June of 1982, all of Best's Detroit drivers were transferred to demolition jobs located in Minnesota.
 
 3. Detroit City Dairy
 
 15
 Brown worked from April 21, 1980, until July 1, 1980, for Detroit City Dairy. He began earning five dollars an hour, and, when he quit, his salary was $7.20 per hour. He claimed that he quit because he could not get a raise. Brown was unemployed from July 3, 1980, until August 13, 1980, when he began working as an over-the-road truck driver. He was terminated from that job in February 1982 after an accident.
 
 
 16
 In the period between 1980 and 1985, City Dairy steadily increased the wages it paid its drivers, and it had a steady demand for more drivers as evidenced by bi-weekly classified ads seeking drivers. In fact, City Dairy's controller responded to an inquiry about Brown's work history by indicating that City Dairy was willing to re-employ Brown even though he had quit them. Brown claimed that he sought re-employment with City Dairy but was told there were no openings.
 
 4. Reitzloff Disposal
 
 17
 Payroll records supplied pursuant to a subpoena revealed that Brown began work for Reitzloff Disposal Company on September 7, 1983. As earlier stated, he used the alias, "James Hunter," in conjunction with his mother's social security number. In a back pay questionnaire submitted to the NLRB on April 4, 1984, Brown indicated that he was currently unemployed and had been throughout 1983. Later, he admitted that he was employed by Reitzloff Disposal but only as early as January 1984. He did not indicate to the NLRB that he was working under an alias, and, in fact, asked the general manager of Reitzloff to use the name Brown rather than Hunter when supplying information to the NLRB.
 
 5. Enviroquip
 
 18
 Brown periodically earned $200 per trip for driving garbage trucks to Knoxville, Tennessee for Enviroquip Corporation. Brown was paid by check. Kevin Reitzloff, Brown's supervisor at Reitzloff Disposal, often gave Brown his check since Reitzloff had family ties with Enviroquip and had authority to draw checks on the separate Enviroquip account. The checks bore Enviroquip's name, and no deductions were withheld. According to Reitzloff, Brown began the trips in the fall of 1984 or spring of 1985. Brown claimed that he did not begin until the summer of 1985 but offered no evidence other than his own testimony.
 
 6. Findings
 
 19
 The ALJ found that Brown intentionally concealed earnings from Reitzloff Disposal for the third and fourth quarters of 1983. The ALJ also found that Brown intentionally concealed earnings from Enviroquip Corporation for the fourth quarter of 1984 and the first three quarters of 1985.
 
 
 20
 The ALJ found that Brown had incurred a willful loss of earnings extending from June 1, 1979, to June 30, 1982, by refusing the job offered him by Best Wrecking Company. The ALJ also found that Brown incurred a willful loss of earnings for the period between July 1, 1982, and July 18, 1985, by unjustifiably quitting his job with Detroit City Dairy and failing to seek re-employment with City Dairy after he lost his job as an over-the-road truck driver.
 
 
 21
 The principal issues presented for review are (1) whether substantial evidence supports the finding that Best Wrecking Company offered Brown a job, (2) whether substantial evidence shows that employment with Best Wrecking Company would have been "substantially equivalent" to employment with City Disposal, (3) whether substantial evidence supports the finding that Brown intentionally sought to conceal earnings from Enviroquip Corporation; and (4) whether the Board erred by failing to remand for an inclusion of pension and health benefits in Brown's back pay award.
 
 II.
 A.
 
 22
 Where the issue before the Board is the amount of an employer's liability to an employee for the unfair labor practice of discharge for engaging in protected activity, the burden on the General Counsel for the NLRB is limited to showing the gross amount of back pay due. NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir.1987). On the other hand, "the burden is on the employer to establish facts which would negative the existence of liability to a given employee or which would mitigate that liability." Id. (emphasis in original) (quoting NLRB v. Reynolds, 399 F.2d 668, 669 (6th Cir.1968)). "[T]he Board's conclusion as to whether an [employer has met its burden] will be overturned on appeal only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings." NLRB v. Westin Hotel, 758 F.2d 1126, 1129-30 (6th Cir.1985).
 
 
 23
 "The Board has broad discretion in fashioning the back pay remedy, and its order cannot be disturbed 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " Overseas Motors, 818 F.2d at 520 (quoting Fiberboard Paper Prod. Corp. v. NLRB, 379 U.S. 203, 216 (1964)).
 
 B.
 
 24
 Brown argues that "there is absolutely no evidence to the effect that [he] was offered a job by Best Wrecking Company." Brown claims that the ALJ abused his discretion by considering a letter from Canfield to City Disposal and Brown's stating that Brown had rejected an offer of employment from Best Wrecking Company because "there is no record that the letter was admitted into evidence either as an exhibit or the contents of the letter were presented through testimony." However, it is clear that the letter was received into evidence as respondent's exhibit 2. J.A.(Supp.) at 30; Tr., Vol. III at 65. Throughout the hearing and on the record, the parties argued about the implications of Canfield's letter declaring that Best had offered Brown employment. Tr., Vol. III at 68, 69, 314, 324-28.
 
 
 25
 Moreover, it is clear from the record that Canfield conceded during the hearing that Brown received an offer from Best Wrecking Company:
 
 
 26
 Judge Holley: Well, let me ask you your theory of the case right now, then. Do you concede or don't you concede that Mr. Brown received an offer of employment from [Best Wrecking Company].
 
 
 27
 Mr. Canfield: Yes, I guess we concede.
 
 
 28
 Judge Holley: You concede that, okay.
 
 
 29
 Id. at 324.
 
 
 30
 In his reply brief, Brown argues that Canfield, as counsel for the General Counsel, did not have the authority to concede that an offer had been made, citing NLRB v. United Food and Commercial Workers Union, 108 S.Ct. 413 (1987). In fact, United Food convinces us that Canfield was doing just what his office was created for.
 
 
 31
 The words, structure, and history of the LMRA amendments to the NLRA clearly reveal that Congress intended to differentiate between the General Counsel's and the Board's "final authority" along a prosecutorial versus adjudicatory line. Section 3(d) of the NLRA provides that the General Counsel has "final authority" regarding the filing, investigation, and "prosecution" of unfair labor practice complaints. Conversely, when the authority of the Board is discussed ... it is in the context of adjudication of complaints....
 
 
 32
 The history of the LMRA also reflects this dichotomy. The House Conference Report on the LMRA states: "... [T]here shall be a General Counsel of the Board ... [who] is to have final authority to act in the name of, but independently of any direction, control, or review by, the Board in respect of the investigation of charges and the issuance of complaints of unfair labor practices, and in respect of the prosecution of such complaints before the Board."
 
 
 33
 United Food, 108 S.Ct. at 421 (citations omitted) (emphasis in original).
 
 
 34
 Because of the General Counsel's grant of authority, the Court concluded in United Food that the General Counsel had unreviewable discretion to decide whether to file or withdraw a complaint and, in the period of time between the filing of a complaint and the hearing, to dismiss a complaint in favor of a formal settlement. Id. at 422. From this grant of authority logically flows the discretion to frame the issues which will be contested at a hearing. See Royal Typewriter Co. v. NLRB, 533 F.2d 1030, 1040 (8th Cir.1976), overruled in part on other grounds, Bryan Memorial Hosp. v. NLRB, 814 F.2d 1259, 1261 (8th Cir.), cert. denied, 484 U.S. 849 (1987).
 
 
 35
 Even if we were inclined to hold that the General Counsel is powerless to concede a point, we would not in this case. Brown, having entered an appearance as charging party, could have taken a position contrary to the General Counsel and pursued it. Kellwood v. NLRB, 411 F.2d 493, 499-500 (8th Cir.1969). However, the most Brown did in this case was to deny under cross-examination that he was offered the job. Afterward, when a long discussion between the court and counsel took place, which led City Disposal to believe that it need not present evidence of the offer, Brown kept silent.[4] Tr., Vol. III at 323-30. In light of Brown's silence, we will not now hold that the concession by Canfield did not constitute substantial evidence of a job offer.
 
 C.
 
 36
 Next, Brown argues, in effect, that even if there were an offer, truck driving for Best Wrecking Company was not "substantially equivalent" to truck driving for City Disposal. He states that the ALJ "made no determination on the desirability of employment with Best Wrecking Company." However, it is clear from the ALJ's analysis that he was guided by the "substantially equivalent" standard in finding that Brown incurred a willful loss of earnings.
 
 
 37
 Much of Brown's argument that the jobs were not comparable is directed at working conditions at Minnesota job sites after Best left Detroit. However, the ALJ concluded that Brown's willful loss ceased when Best transferred all drivers from Detroit to Minnesota job sites. The ALJ reasoned that Brown would have been justified in refusing to transfer from Detroit to Minnesota. Thus, Brown's arguments concerning working conditions at Minnesota job sites are misdirected.
 
 
 38
 Brown also argues that the high turnover among Best Wrecking drivers shows the undesirability of the job. Mardigian, part-owner of Best Wrecking, testified that a high turnover rate was typical of the industry. He also said that three of his drivers had been with Best for a long period of time. According to Mardigian, his equipment was similar to the equipment owned by City Disposal and his drivers were paid higher wages and worked shorter hours than City Disposal drivers. In our view, Mardigian's testimony was enough to convince a reasonable person that the jobs were substantially equivalent. The record indicates that even more evidence could have been presented but for the combination of Canfield's concession and Brown's failure to oppose the concession. Thus, we hold that there was substantial evidence for finding that Brown incurred a willful loss of earnings when he refused a job offer from Best Wrecking Company.
 
 D.
 
 39
 Brown argues that there was not substantial evidence for finding that he intentionally concealed earnings from Enviroquip Corporation.[5] It is uncontested that Brown made numerous trips for Enviroquip Corporation and that he was paid $200 per trip. The Enviroquip checks bore Enviroquip's name, but Reitzloff's checks bore Reitzloff's name. Enviroquip checks withheld no deductions. Even Brown acknowledged that there were two accounts--one for Reitzloff and one for Enviroquip.
 
 
 40
 Also, the ALJ noted that despite Brown's contention that he mistakenly believed that his Enviroquip earnings were reported by Reitzloff, Brown must have known that as of the date of the hearing that Enviroquip earnings had not been reported, but Brown made no attempt to cure the omission in the months following the hearing when the record was kept open for additional evidence. We agree that Brown's continuing failure to disclose is indicative of willful concealment. American Navigation Co. v. NLRB, 268 NLRB 426 (1983) (award of full back pay where continuing failure to disclose prevents accurate calculation of interim earnings would not further purposes of the act); see also NLRB v. Flite Chief, Inc., 640 F.2d 989, 991-92 (9th Cir.1981) (not persuaded of honesty where disclosure was postponed until "11th hour" and then only made in response to subpoena).
 
 
 41
 We hold that Brown's use of the alias and unauthorized social security number during the period in question, his failure to report Enviroquip earnings to the IRS, his knowledge that the payment was made from a separate account and without deductions, and his failure to report the Enviroquip earnings are substantial evidence that he intentionally concealed earnings from Enviroquip Corporation.
 
 
 42
 Brown also argues that even if the ALJ was correct that he intentionally concealed earnings from Enviroquip, the ALJ erred in concluding that he had earned money from them as early as the third quarter of 1984. No witness at the hearing could clearly establish the date Brown began working for Enviroquip. Brown points to his own testimony; however, the ALJ found on the basis of substantial evidence that Brown's testimony could not be believed. Kevin Reitzloff testified that Brown probably began in the spring of 1985, "[m]ay be the fall of '84 at the earliest. But I think it was in calendar '85." Tr., Vol. III at 408. The ALJ was justified in resolving the doubt against Brown once he determined that Brown was guilty of concealing earnings. See McCann Steel Co. v. NLRB, 570 F.2d 652, 654 (6th Cir.1978) ("The allocation of the burden of producing evidence ... is upon the party having knowledge of the facts."); American Navigation, 268 NLRB at ---- n. 6 ("[W]e will ... deny all back pay to claimants whose intentionally concealed employment cannot be attributed to a specific quarter or quarters because of the claimant's deception."); Flite Chief, 640 F.2d at 992. Thus, we find substantial evidence to support the finding that Brown intentionally concealed earnings from Enviroquip Corporation as early as the fourth quarter of 1984.
 
 E.
 
 43
 Finally, Brown argues that the ALJ erred by not including health and pension benefits in his back pay. The law is clear that health and pension benefits are payable as back pay. East Wind Enter. v. NLRB, 268 NLRB 655 (1984). However, the burden is upon the General Counsel to establish that pension and health contributions were part of the gross pay that the discriminatee would have earned but for the unfair labor practice. Id.
 
 
 44
 The Board found "no evidence in the record that pension contributions or health plan benefits exist or should have been included in the back pay specification." Brown argues that there was evidence in the record that pension contributions and health benefits existed because his employment contract with City Disposal was made part of the record in the underlying unfair labor practice proceeding wherein the Board found his discharge was illegal. There is authority for the proposition that the employment contract could have been considered by the ALJ. S.D. Warren Co. v. NLRB, 353 F.2d 494, 497 (1st Cir.), cert. denied, 383 U.S. 958 (1965) (Board in unfair labor practice hearing could take judicial notice of evidence previously offered by same party in representation hearing). However, Brown has pointed to no authority, and we have found none, for the proposition that the ALJ was bound sua sponte to consider the collective bargaining agreement as part of the record in the back pay proceeding.
 
 
 45
 We are guided in this regard by the Federal Rules of Evidence which are applied "so far as practical" in hearings before the Board. 29 U.S.C. Sec. 160(b); NLRB v. West Side Carpet Cleaning Co., 329 F.2d 758, 760 (6th Cir.1964). Under the Federal Rules of Evidence, judicial notice is not mandatory unless "requested by a party." Fed.R.Evid. 201(c) & (d). The record shows that in this case neither party at the hearing requested the ALJ to take judicial notice of the employment contract.
 
 
 46
 Brown tried to excuse his failure to raise the issue with the ALJ by arguing to the Board that "because [he] entered no appearance and proceeded without counsel at the hearing, he was not in a position to raise these issues at that time." The Board found that contrary to Brown's assertions, he did enter a formal appearance in his own behalf at the hearing.[6] The record confirms the Board's finding.
 
 
 47
 Judge Holley: Would the parties please state their appearances for the record.
 
 
 48
 * * *
 
 
 49
 * * *
 
 
 50
 Judge Holley: Any other parties that desire to enter an appearance?
 
 
 51
 Mr. Canfield: Your honor, I believe the Charging Party's going to enter an appearance.
 
 
 52
 Judge Holley: Fine.
 
 
 53
 Mr. Brown: James Brown, 20190 Riopelle, Detroit, Michigan.
 
 
 54
 Tr., Vol. III at 4. Thus, Brown, as charging party, had the right and opportunity to bring the employment contract to the ALJ's attention. See Kellwood Co. v. NLRB, 411 F.2d 493, 499-500 (8th Cir.1969); International Union of Elec., Radio & Machine Workers v. NLRB 289 F.2d 757, 760 (D.C.Cir.1960).
 
 
 55
 Brown also had the opportunity to raise the issue of pension and health benefits by filing exceptions to the ALJ's order. The Board has set out a procedure for filing exceptions in 29 CFR Sec. 102.46 (1989) which provides in relevant part:
 
 
 56
 (a) Within 28 days, or within such further period as the Board may allow, from the date of the service of the order transferring the case to the Board, pursuant to Sec. 102.45, any party may ... file with the Board in Washington, D.C., exceptions to the administrative law judge's decision or to any other part of the record or proceedings....
 
 
 57
 (b)(1) ...
 
 
 58
 (2) Any exception to a ruling, finding, conclusion, or recommendation which is not specifically urged shall be deemed to have been waived. Any exception which fails to comply with the foregoing requirements may be disregarded.
 
 
 59
 * * *
 
 
 60
 * * *
 
 
 61
 (h) No matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding. (Emphasis added)
 
 
 62
 If timely and proper exceptions are not filed pursuant to 29 C.F.R. Sec. 102.46, the findings of the ALJ "automatically become the decision and order of the Board and become its findings, conclusions, and order, and all objections and exceptions thereto [are] deemed waived for all purposes." 29 C.F.R. Sec. 102.48(a) (1989). "It is only in cases of rare extenuating circumstances that the courts have waived the rules requiring the filing of exceptions within the time prescribed by the statute or extended by the Board." NLRB v. Ferraro's Bakery, Inc., 353 F.2d 366, 368 (6th Cir.1965).
 
 
 63
 In this case, the ALJ issued his supplemental decision on July 14, 1987. Brown filed exceptions with the Board on January 11, 1988, but he failed to raise the issue of pension and health benefits. Brown waited until February 4, 1988, in his motion to remand which was filed out of time, to object to the exclusion of pension and health benefits. Thus, we find that Brown waived any right to object to the exclusion of pension and health benefits from his back pay award by his failure to timely take exception under 29 C.F.R. Sec. 102.46.
 
 
 64
 Brown argues that it was "manifest error" to "refuse to even consider the pension and health benefits." Brown points to no authority to show either that the rule of manifest error applies to NLRB back pay proceedings, or that it is manifest error to consider pension and health benefits in a back pay proceeding. The cases Brown cites are criminal cases recognizing the doctrine of plain error.[7]
 
 
 65
 Even if it is manifest error to refuse to consider pension and health benefits in a back pay proceeding, that is not the case before us. The record before us shows that the ALJ did not refuse to consider the benefits, but did not consider them because they were not brought to his attention by way of a request for judicial notice. Similarly, the Board did not refuse to consider the benefits but found that Brown's asserted reasons for his untimeliness were untrue and without merit. Given Brown's failure to ask the ALJ to judicially notice the contract provisions dealing with pension and health benefits, and his untimeliness in objecting to the exclusion of the benefits, we find no manifest error in either the ALJ's or the Board's failure to include the benefits in Brown's back pay award.
 
 III.
 
 66
 Accordingly, for the reasons stated, we deny Brown's petition to set aside the Board's order.
 
 
 
 [1]
 The rationale for denial of intervention was not stated, but it is apparent that the motion was untimely under Federal Rule of Appellate Procedure 15(d)
 
 
 [2]
 At first glance it might appear that our April 18, 1989, order of enforcement would be res judicata to this proceeding. The Supreme Court discussed that possibility as part of its rationale for allowing intervention by interested parties in United Auto., Aerospace and Agric. Implement Workers v. Scofield, 382 U.S. 205, 213 (1965) as follows: "To be sure, if intervention is denied in the initial review proceeding, the charged party would not be bound by the decision under technical res judicata rules."
 
 
 [3]
 When opposing counsel pointed out Canfield's concession to Brown, Brown answered, "I am aware of that, yes. Not that I agree with it."
 
 
 [4]
 Brown presents a misleading argument by claiming that the ALJ ordered City Disposal to present evidence of the job offer. It is true that the ALJ stated at one point that City Disposal should present evidence of the offer; however, the ALJ's statement came when Canfield expressed an intention to recant his concession. When the ALJ's statement is examined in context, it is apparent that the ALJ accepted Canfield's concession and did not require proof of the offer
 
 
 [5]
 Much of Brown's argument on this point is misdirected. He tries to prove that there was no intentional concealment by showing that Enviroquip and Reitzloff were joint employers. Assuming arguendo that the latter proposition is true, the former does not follow from the latter. Common sense teaches that a person could intentionally conceal part of his earnings even from a single employer, especially if he knew that part of the earnings came from a payroll account and another part came from a separate account
 
 
 [6]
 Brown also raises arguments that Canfield was not concerned with his rights, that there was a conflict of interest between the positions of Canfield and himself, and that he objected a number of times to Canfield's failure to mention health and pension benefits. However, Brown offers nothing from the record to substantiate his accusations
 
 
 [7]
 Brown relies on Clyatt v. United States, 197 U.S. 207 (1905), and Wiborg v. United States, 163 U.S. 632 (1896). We note that application of the plain error doctrine is discretionary and is applied "only [where] the failure to do so would result in a manifest miscarriage of justice." Finch v. Monumental Life Ins. Co., 820 F.2d 1426, 1432 (6th Cir.1987) (quoting United States v. Grosso, 358 F.2d 154, 158 (3d Cir.1966), rev'd on other grounds, 390 U.S. 62 (1968)). We perceive no such danger in this case