989 F.2d 1246
 300 U.S.App.D.C. 374, Util. L. Rep. P 13,934
 PHILADELPHIA GAS WORKS and Long Island Lighting Company, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Texas Eastern Transmission Corporation, UGI Corporation,
Public Service Electric & Gas Company, Municipal Defense
Group, Bay State Gas Company, et al., Equitrans, Inc., The
Brooklyn Union Gas Company, Intervenors.
 No. 91-1478.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 8, 1993.
Decided April 16, 1993.
 
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Robert A. MacDonnell, with whom Allen Weinberg, Laureto A. Farinas, O. Julia Weller, and Benga L. Farina were on the brief, for petitioners.
 Timm L. Abendroth, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., were on the brief, for respondent.
 
 
 1
 Henry S. May, Jr., with whom F. Nan Wagoner, Judy M. Johnson, D. Virginia Smith, and Charles F. Caldwell were on the brief, for intervenor Texas Eastern Transmission Corp.
 
 
 2
 Mary E. Baluss and J.R. Clark entered appearances, for intervenor UGI Corp.
 
 
 3
 Kenneth D. Brown entered an appearance, for intervenor Public Service Elec. & Gas Co.
 
 
 4
 Mark C. Darrell and Stanley W. Balis entered appearances, for intervenor Mun. Defense Group.
 
 
 5
 Cheryl L. Jones and Gearold L. Knowles entered appearances, for intervenor Bay State Gas Co., et al.
 
 
 6
 Frank H. Markle entered an appearance, for intervenor Equitrans, Inc.
 
 
 7
 Roderick D. Strickland entered an appearance, for intervenor The Brooklyn Union Gas Co.
 
 
 8
 Before: MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.
 
 
 9
 [300 U.S.App.D.C. 375] Opinion for the Court filed by Circuit Judge SILBERMAN.
 
 
 10
 Dissenting opinion filed by Circuit Judge RANDOLPH.
 
 SILBERMAN, Circuit Judge:
 
 11
 Petitioners, a pipeline's customers, challenge FERC's approval of the pipeline's charge via the purchased gas adjustment (PGA) mechanism for overrun penalties that the pipeline paid to its suppliers. We remand to the Commission for a fuller explanation of its decision and particularly so that FERC may reconcile a prior case.
 
 I.
 
 12
 During the 1960's and 1970's United Gas Pipeline Company (United) was one of Texas Eastern Transmission Corporation's (Texas Eastern) principal suppliers of gas. By the late 1980's, however, Texas Eastern had shifted to other sources and relied on United only for infrequent purchases. For the 1989-1990 winter heating season, Texas Eastern reserved enough gas to supply its customers during an average winter from sources other than United. Texas Eastern then considered whether to reserve any gas from United to deal with the possibility of an unusually cold winter. United apportions its fixed costs among its customers based in part on the amount of gas a customer actually uses (D-1 charges) and in part on the quantity that United must stand ready to supply (D-2 charges). See Panhandle Eastern Pipe Line Co. v. FERC, 881 F.2d 1101, 1106, 1110-13 (D.C.Cir.1989). Although some other pipelines allow a customer to reserve gas without paying D-2 charges, under United's tariff, a customer must make a D-2 nomination and incur D-2 charges to guarantee a quantity of gas. See United Gas Pipe Line Co., 46 F.E.R.C. p 61,314 (1989). Furthermore, under that tariff if a customer subsequently purchases more gas than it has nominated (reserved), United assesses an overrun penalty (which, per unit, is much larger than D-2 charges) on the purchase of unreserved gas. The overrun penalties, along with the risk of unavailability, obviously provide customers with a disincentive to attempt to avoid their share of the supplier's fixed costs by nominating a lower amount than they expect to need.
 
 
 13
 Based on United's rate structure, Texas Eastern contemplated two approaches in planning for an abnormally cold winter. Texas Eastern could have made a sizeable D-2 nomination with United, which would have guaranteed Texas Eastern access to enough gas for even the coldest winter but would have obligated it to pay a percentage of United's fixed costs without regard to the amount of gas ultimately purchased. Alternatively, Texas Eastern could have declined to make any D-2 nomination, which would have required Texas Eastern to pay the substantial per unit overrun penalty for any gas that it ordered from United, but would have involved no up front D-2 charges. Although it was conceivable that in an unprecedentedly cold winter Texas Eastern would need to purchase enough gas from United that the total payment under the second option (gas cost plus overrun penalties) might exceed the D-2 fee, Texas Eastern estimated that in most years, even if it needed extra units from United, it would be better off making a D-2 nomination of zero.[1] Texas Eastern took the second option and hoped for a mild winter.
 
 
 14
 As it happened, Texas Eastern's service area suffered through a prolonged cold snap in December of 1989. Texas Eastern initially sought to persuade United to waive the overrun penalties, but after United refused, Texas Eastern purchased gas from United and incurred the penalties. United eventually accepted $8.2 million as a settlement for these charges. The weather moderated during the remainder of the 1989-1990 winter season, and Texas Eastern [300 U.S.App.D.C. 376] shifted back to its other suppliers. At the end of the season, Texas Eastern calculated that, despite the overrun penalties, it had saved money by not making a D-2 nomination.
 
 
 15
 Although pipelines gain approval of their base tariffs in a rate proceeding under section 4 of the Natural Gas Act, 15 U.S.C. § 717c, they can alter those rates through a PGA filing which does not involve the cumbersome data production and procedural requirements of a formal section 4 proceeding. See Consolidated Edison Co. v. FERC, 958 F.2d 429, 432 (D.C.Cir.1992). FERC created this more flexible procedure because it recognized that the rates that pipelines charge are largely a function of the cost of gas, which fluctuates frequently. Accordingly, suppliers can take advantage of the expedited procedure to recover "gas costs," but only gas costs. In the fall of 1990, Texas Eastern included the overrun penalties as a recoverable cost of gas in its PGA filing. A group of Texas Eastern's customers, the Municipal Defense Group (MDG), objected. FERC, relying on its earlier decision in North Penn Gas Co., 29 F.E.R.C. p 61,275 (1984), determined that the overrun penalties were not a cost of gas and ordered Texas Eastern to remove the penalties from its PGA filing. See Texas Eastern Transmission Corp., 54 F.E.R.C. p 61,078 (January 31, 1991) (Texas Eastern I ). FERC observed that Texas Eastern could attempt to recover the overrun penalties through a section 4 proceeding. See id. at 61,258.
 
 
 16
 After FERC issued the order, MDG met with Texas Eastern, and based on their discussions, MDG formally withdrew its protest. Texas Eastern thereupon filed a request for rehearing and/or clarification attacking the original order. FERC granted the rehearing and issued a new order allowing Texas Eastern to include the overrun penalties in its PGA filing. See Texas Eastern Transmission Corp., 55 F.E.R.C. p 61,353 (June 3, 1991) (Texas Eastern II ). After detailing the chain of events that led Texas Eastern to incur the penalties, FERC justified its reversal by stating that, "given MDG's withdrawal of its protest, and under the unique facts and circumstances in this case, granting rehearing on this issue is warranted." Id. at 62,048. FERC did not mention the North Penn precedent on which it relied in its original order. Commissioner Trabandt dissented and criticized the majority for replacing the " 'no penalties in PGA' bright line test with a results oriented test based on purported customer savings." Id. at 62,049.
 
 
 17
 FERC's rehearing order prompted Philadelphia Gas Works and Long Island Lighting Company, both customers of Texas Eastern, to renew MDG's original argument that North Penn compelled FERC to exclude overrun penalties from the PGA mechanism. FERC denied this second request for rehearing. See Texas Eastern Transmission Corp., 56 F.E.R.C. p 61,204 (August 2, 1991) (Texas Eastern III ). FERC reiterated that the "unique facts and circumstances" of the case justified the recovery of the overrun penalties through the PGA mechanism. In rejecting petitioners' argument that North Penn controlled, FERC observed that, "[i]n determining issues before it, the Commission has discretion to determine whether the facts require that equity be applied in deciding those issues. Nothing in North Penn changes this." Id. at 61,828. Commissioner Trabandt again dissented. Philadelphia Gas Works and Long Island Lighting Company petition for review of FERC's orders permitting Texas Eastern to include the overrun penalties in its PGA filing.
 
 II.
 
 18
 Petitioners claim that when FERC reversed its position on rehearing, it changed course without any real explanation. According to petitioners, North Penn stated broadly that pipelines could not pass on to their customers, through the PGA mechanism, penalty fees incurred under suppliers' tariffs because those fees were not "gas costs." Indeed, in its initial order in this case FERC itself relied squarely on North Penn to deny Texas Eastern's PGA filing. It noted that the pipeline could attempt to recover its costs in a formal section 4 filing, but not through the simplified PGA procedure. We were told at oral [300 U.S.App.D.C. 377] argument, however, that it is not at all clear whether Texas Eastern will be able to recover its full costs in a section 4 filing.[2] That issue is, of course, not before us, but suffice it to note that FERC's decision would have increased Texas Eastern's procedural burdens and might have barred recovery entirely. FERC responds that the petitioners and the dissenting Commissioner have overread North Penn: it is a narrow decision limited to its facts and should not be interpreted broadly.
 
 
 19
 Although North Penn and the previous orders in that case are rather sketchy, we deduce that North Penn, a pipeline, invoked a force majeure clause (for some undetermined reason) in its gas pipeline supplier's tariff and, accordingly, did not take or pay for certain gas. Subsequently, however, North Penn paid for the gas not taken as well as late payment charges and sought to pass on those costs through the PGA mechanism. FERC, without determining the legality of North Penn's invocation of the force majeure clause, rejected the effort to pass on the late payment charges through the PGA mechanism and said:
 
 
 20
 North Penn's request for rehearing is denied. The facts of this case demonstrate that North Penn made a corporate decision to invoke the force majeure provision of its contract with its pipeline suppliers to withhold payment of minimum bill charges. Late payment penalties incurred by North Penn as a result of this management decision do not reflect the cost of gas to North Penn, but reflect fees incurred by the company that are a direct result of its decision not to pay minimum bill costs to its pipeline suppliers. Late payment costs, or penalty fees, are not gas costs and are not to be passed to North Penn's customers through the PGA mechanism.
 
 
 21
 North Penn, 29 F.E.R.C. at 61,565 (emphasis added).
 
 
 22
 FERC argues (seriously, we assume) that the phrase, "[t]he facts of this case" somehow qualifies or limits the phrase, "[l]ate payment costs, or penalty fees, are not gas costs," which petitioner emphasizes. But, as should be obvious, FERC referred to the facts of the case only for the purpose of describing North Penn's decision to invoke its force majeure clause as a discretionary management decision. FERC did not say that "the late penalty fees described by the facts of this case are not gas costs." Nothing in North Penn suggests that FERC was diffident or cautious in asserting that late payment fees or penalties were not "gas costs." Certainly, in Texas Eastern I FERC read North Penn as setting forth a categorical principle: "In North Penn Gas Company, the Commission held that penalty fees, incurred as the result of a pipeline's management decision, are not purchased gas costs." Texas Eastern I, 54 F.E.R.C. at 61,257-58 (emphasis added).
 
 
 23
 We, therefore, reject FERC's unpersuasive attempt in its third order (and before us) to sidestep North Penn's broad language. But that is not to suggest that FERC was necessarily inhibited in a subsequent case from expressly limiting or qualifying (or even disavowing) its general statement in North Penn. It might well be thought that the phrase "penalty fees" was too broad, and it is by no means apparent from examination of North Penn exactly why the late payments or penalty fees were disallowed in that case. FERC, arguing alternatively, would have us understand that it did narrow North Penn in its proceedings in this case.
 
 
 24
 This narrowing construction, however, is not apparent in any of FERC's orders. In its first rehearing order, FERC emphasized Texas Eastern's claim that its decision to make zero D-2 nominations had saved its customers a good deal of money and that MDG, apparently accepting the prudence of that choice, had withdrawn its protest. Based on "the unique facts and circumstances in this case," FERC granted the petition for rehearing and allowed Texas Eastern to pass through the overrun penalties [300 U.S.App.D.C. 378] as gas costs. Texas Eastern II, 55 F.E.R.C. at 62,048. Then, petitioners filed their own rehearing petition, which complained that FERC should not have relied on MDG's withdrawal since petitioners were also injured by Texas Eastern's decision and that FERC had violated its own precedent by not following North Penn. In rejecting this second rehearing petition, FERC denied that it had relied unduly[3] on MDG's withdrawal and reiterated Texas Eastern's contention that it had saved its customers money. See Texas Eastern III, 56 F.E.R.C. at 61,827-28. As to North Penn, FERC said only that, "[i]n determining issues before it, the Commission has discretion to determine whether the facts require that equity be applied by deciding those issues. Nothing in North Penn changes this." Id. at 61,828.
 
 
 25
 Of course, FERC can consider new facts and circumstances to limit North Penn and is entitled to weigh "equitable" considerations as it thinks appropriate. But it must identify the facts, circumstances, and equitable factors on which it relies. See Atchison, Topeka & Santa Fe Ry. v. Wichita Bd. of Trade, 412 U.S. 800, 809, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973) (stating that the agency must "assert[ ] distinctions that ... reveal the policies [it] is pursuing"); Hatch v. FERC, 654 F.2d 825, 834 (D.C.Cir.1981) (noting that FERC must provide "a reasoned explanation for any ... failure to adhere to its own precedents"). In this case, we are quite uncertain which equitable considerations FERC found critical and how those factors relate to North Penn. Does the Commission imply (as the dissenting Commissioner suggests) that if a pipeline incurs penalty charges as part of a course of action that turns out to save its customers money, those penalty charges can be passed on as gas costs? Or does FERC mean that penalty charges can be passed on because Texas Eastern faced with a variety of potential scenarios picked the most prudent of its options? In other words, did the Commission apply an ex post or ex ante test in this case? And, more important, how does the result in this case relate to North Penn? The Commission did not say in North Penn whether the customers were ultimately advantaged or disadvantaged by North Penn's decision to invoke the force majeure clause and incur the late penalties. Nor did the Commission even consider whether North Penn's actions were prudent.
 
 
 26
 The intervenors and FERC's counsel suggest various grounds upon which North Penn can be distinguished. All of those distinctions, however, imply a policy course which, under Chenery I, FERC, not we (or FERC's appellate lawyers), must adopt. See SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) (Chenery I ); KN Energy, Inc. v. FERC, 968 F.2d 1295, 1303 (D.C.Cir.1992). (Indeed, it is even unclear from FERC's orders whether the North Penn doctrine is necessarily implicated when a clause in a tariff designated as a "penalty" comes into play.[4] ). It is true, as our dissenting colleague points out, that the Court ordered a remand in Chenery I because the agency's appellate lawyers urged a different legal theory than the agency had adopted. But we have recognized that Chenery I's premise--reviewing courts may affirm based only on reasoning set forth by the agency itself--applies equally when the agency gives an inadequate explanation for its conclusions. E.g., Algonquin Gas Transmission Co. v. FERC, 948 F.2d 1305, 1315-16 (D.C.Cir.1991). The agency has, in that event, not fully complied with 5 U.S.C. § 557(c) which obliges the agency to set forth its "conclusions, and the reasons or basis therefor." Cf. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 199, 61 S.Ct. 845, 855, 85 L.Ed. 1271 (1941). And under Chenery, neither the agency's appellate counsel nor, a fortiori, appellate judges can cure that defect. The dissent would read the FERC orders as holding that a [300 U.S.App.D.C. 379] pipeline's penalty costs may be passed through the PGA mechanism if it turns out (ex post ) that the pipeline's course of action that caused the penalty costs to be assessed, on the whole, saved the pipeline customers money. But the orders do not say that; indeed, FERC's brief does not explain the Commission's orders in those terms. See Respondent's Br. at 8. ("[T]he Commission left open questions of what costs may properly be included in the PGA for case-by-case consideration.") If we were to read the FERC orders as does the dissent, not only would we be glossing over the North Penn precedent problem, we would oblige FERC implicitly to accept a regulatory policy principle that it has not yet indicated it wishes to adopt.
 
 
 27
 FERC reminds us that it is axiomatic as a matter of administrative law that an agency may proceed to elaborate its interpretation of statutes by either adjudication or rulemaking. See SEC v. Chenery Corp., 332 U.S. 194, 202-03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (Chenery II ). We take FERC to mean that, when an agency adjudicates, it typically adopts less generic or sweeping positions than it would when adopting a rule, and that petitioners' quarrel with FERC's order is really a challenge to FERC's decision to proceed through adjudication rather than rulemaking. To be sure, the comparative advantage of making regulatory policy through adjudication rather than rulemaking is that the former can be less categorical, in a sense more tentative. But when an agency proceeds by adjudication rather than by rule, it must include sufficient reasoning to explain why it acted as it did. Regulated parties and their counsel can then, as lawyers do, seek to measure the scope of the ratio decidendi, so as to predict how future cases will be decided, and therefore how behavior should be shaped. For FERC to utter the words "unique facts and circumstances" and "equity," as it did here, as a wand waved over an undifferentiated porridge of facts, leaves regulated parties and a reviewing court completely in the dark as to the core of FERC's reasoning and its relationship to past precedent--the holding of the case. Without more explanation, it is impossible to say whether FERC has acted reasonably or capriciously.
 
 
 28
 * * * * * *
 
 
 29
 For the foregoing reasons, we grant the petition for review and remand the case to the Commission.
 
 RANDOLPH, Circuit Judge, dissenting:
 
 30
 Unlike my colleagues I have no difficulty discerning FERC's path of decision, its reasons for reaching its result, or the rule of law FERC laid down. Remanding this case for a more thorough opinion is, to my mind, a waste of time for all concerned, an exercise in formalism unsupportable by logic or law. The opinion writers at FERC often can improve their products. So can the courts, particularly when judges seek to explain away precedents. The process of distinguishing one case from another involves finding legally relevant differences between the two. Stare decisis itself demands analogical reasoning. To describe differences between the cases as a ground of decision is therefore to state a rule of law. That is the course FERC followed, and I see no legal basis for a reviewing court's demanding more of the agency.
 
 
 31
 As FERC cases go, this one is refreshingly simple. In 1984, at the end of a short two-paragraph opinion, FERC stated: "Late payment costs, or penalty fees, are not gas costs and are not to be passed to [the pipeline's] customers through the PGA mechanism." North Penn Gas Co., 29 F.E.R.C. p 61,275 (1984). Little care went into the drafting. The words "penalty fees" seem to be modified by "late," but this is not entirely clear. Furthermore, FERC supported the quoted sentence with a footnote citing "18 U.S.C. § 154.38(d)(4)," an obvious error when one realizes that 18 U.S.C. contains the federal criminal code. The substance of the decision was, in any event, scarcely earth-shaking. North Penn had failed to pay its suppliers on time, its suppliers imposed "late payment penalties," and FERC decided that the pipeline's customers did not have to foot the bill, at least not through the purchased gas adjustment (PGA), for what was the equivalent of interest on outstanding debt.
 
 
 32
 [300 U.S.App.D.C. 380] FERC never cited North Penn again, until its initial decision in this case rejecting Texas Eastern Transmission Corporation's attempt to use the PGA to pass on to its customers $8.2 million in "penalties" resulting from excess gas purchases during a very cold December. Texas Eastern Transmission Corp., 54 F.E.R.C. p 61,078 (Jan. 31, 1991). When FERC discovered that Texas Eastern had incurred these charges, not out of imprudence, but in order to avoid paying out $26.2 million to nominate additional supplies of gas for the entire winter, the agency reversed itself. Texas Eastern Transmission Corp., 55 F.E.R.C. p 61,353, at 62,047 (June 3, 1991). Texas Eastern's customers were "better off" getting gas with the penalties added than without them; the company's other options were to incur much larger costs by nominating additional volumes of gas in advance or to curtail gas supplies during the winter. Id. Citing these "unique facts and circumstances," FERC allowed the charges to be passed through to the customers. Id. at 62,048.
 
 
 33
 If, as FERC said, the facts in Texas Eastern were "unique," it necessarily follows that the same facts did not exist in North Penn. Those facts therefore enable one to discern the ratio decidendi of Texas Eastern. The legal rule is easily formulated: when a pipeline incurs charges designated as "penalties" in order to supply its customers with needed gas at a cheaper price than if the penalties were not incurred, those charges reflect the cost of gas to the pipeline and therefore can be passed on to the pipeline's customers through the PGA. That strikes me as a rational decision, beneficial to customers, well within FERC's discretion, and a sufficient distinction of North Penn. It may not be a very broad rule of decision. It may be site-specific. It may not solve all or many future cases. But none of that is of any moment. There is nothing wrong with agencies confining their adjudicative decision to the case before them. Dicta in agency decision-making is as problematical as dicta in judicial opinions.
 
 
 34
 The majority thinks that if the case is not sent back it would run afoul of Chenery I. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). The Chenery doctrine comes into play when an agency relies on the wrong reason for its result. Even by the majority's lights, that is not this case. The point of contention is in applying the principle "that a reviewing court may reverse and remand if an agency has not adequately explained the reasons for its conclusions," a principle "sometimes misconstrued as included within the 'Chenery doctrine,' " but one that actually stems from another source. Henry J. Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 DUKE L.J. 199, 206. First fully articulated in Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), the principle is now embodied in the Administrative Procedure Act, 5 U.S.C. § 557(c), which requires agencies to state their "findings and conclusions, and the reasons or basis therefor...." An agency satisfies this requirement if its decisional "path may reasonably be discerned," Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). FERC's route in Texas Eastern is already reasonably, indeed readily, discernible. Yet the majority orders a remand so that FERC can draw us a map. I respectfully dissent.
 
 
 
 [1]
 Under United's tariff, customers must make their D-2 nominations in terms of units of gas needed per day and must nominate the same amount for each day of the 151-day winter heating season. Overrun penalties, by contrast, are assessed on a simple per unit basis. For a customer like Texas Eastern that planned to purchase gas from United on only a small percentage of the 151 days, even very large overrun penalties would not provide an incentive to make D-2 nominations (provided both costs are recoverable)
 
 
 [2]
 If it turns out that certain "penalties" are not recoverable in any proceeding, regulated companies will choose a recoverable cost, like a D-2 fee, no matter how high, rather than take any chance of incurring a nonrecoverable penalty that will have to be paid directly out of management's profits
 
 
 [3]
 It may well be that the real difficulty in this case is that FERC granted the rehearing petition because it thought there was no opposition and then was stuck with a position that it was not prepared to rationalize
 
 
 [4]
 That a party's tariff designates a charge as a "penalty" would not seem to be all that important in determining whether it can be passed on